Argued and submitted May 28, 1997; resubmitted En Banc August 12, affirmed
December 9, 1998

STATE OF OREGON,
*Respondent,*

*v.*

NEIL BENNETT STAFFORD,
*Appellant.*

(94CR0927; CA A90616)

972 P2d 47

David E. Groom, Deputy Public Defender, argued the cause for appellant. With him on the briefs were Sally L. Avera, Public Defender, and Neil Bennett Stafford, *pro se*.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

EDMONDS, J.

Deits, C. J., concurring.

Warren, J., concurring.

De Muniz, J., dissenting.

Landau, J., dissenting.

## EDMONDS, J.

Defendant appeals from his convictions for three counts of attempted sexual abuse in the first degree, ORS 163.427, and one count of attempted coercion, ORS 163.275. We affirm.

According to the evidence, defendant worked for a business that offered tutoring to school age children. On the morning in question, an eight-year-old student attended a session with defendant; there were no other children at the tutoring facility at that time. Defendant moved to where the child was sitting, placed the palm of his hand on her bare upper thigh and kept it there for about five seconds. Although the child had not complained previously about the room being cold, defendant asked her if she was cold. He turned on the heater in the room, and about five minutes later, he touched her thigh in the same place, again for about five seconds. Later when the child wanted to look over a room divider, defendant picked her up by placing his hands under her arms with his fingers on her chest. Still later, defendant touched the child's thigh again as he reached over to grab a pencil or to show her something.

The child reported the touchings to her parents and indicated to them that they had made her feel uncomfortable. The parents reported the incident to law enforcement authorities, who initiated an investigation. Meanwhile, a second child reported that, during approximately the same period of time, defendant had made her feel uncomfortable on a number of occasions by caressing her mid-thigh with his hand and by looking down her shirt. The child asked defendant to stop his behavior, but he declined. After the child told defendant that she was going to tell her mother about his behavior, he warned her that if she told anyone about his conduct, he would hurt her. The state also offered evidence from three witnesses from California where defendant had lived previously. Those witnesses testified that they had been molested by defendant under similar circumstances. That conduct occurred 17 years earlier for two witnesses and 24 years earlier for another witness.

After the police investigation was completed, defendant was charged with the above crimes. At trial, defendant took the position that his behavior had been misinterpreted by the children and was not related to any interest in sexual gratification. In defendant's first assignment of error, he argues that the trial court erred by denying his motion to exclude the testimony of Dr. Michael Knapp, a licensed clinical psychologist. Knapp testified that he has had specialized training in the treatment of persons who have been charged with or convicted of sexual crimes, has treated sex offenders throughout his professional career, has conducted group and individual therapy, and has made psychological assessments of offenders. While in practice, he has continued to take courses in the field of sexual abuse, has written an article on sexual abuse issues and has testified in court on such issues. At the time of trial, he was administering an offender treatment program involving approximately 40 adult male offenders.

At trial, Knapp was asked whether there is a concept known as "grooming" in his specialty. He was next asked to explain what the concept means. On direct and cross-examination, Knapp indicated that, within the field of sex offender treatment, the word "grooming" describes a pattern of behavior that offenders generally go through to prepare a victim for the eventual abusive behavior. He said that "grooming behavior" often involves the offender trying to make friends with the child, while at the same time exposing the child to varying degrees of touching that are at first nonsexual but then progress to become sexual.[1] On cross-examination,

---

[1] Knapp testified:

"When an offender prepares a child for ultimate sexual victimization, he has to get close to the child and create a relationship with the child. And grooming is the term that's used to describe this behavior on the offender's part, of getting close to a child, making friends with the child, becoming perhaps a confidant of the child, getting the child used to certain kinds of touching, play activities. Most offenders that I know groom with relationship; that is, they become a confidant, friend, close associate of the child, do many things with the child, buy them gifts. Many of them expose the child to varying degrees of touching that [are] non-sexual in nature, but eventually leads up to sexual touching; touching on the legs, the arms, back rub, applying suntan lotion, often using legitimate reasons like that for the touching.

"Also, in grooming there's this concept that the offender very subtly oftentimes leads the child into feeling somehow responsible. Some offenders might

Knapp indicated that, within the field of sex offender treatment, the word "grooming" refers to a pattern of behavior that some offenders go through and that, essentially, he makes a "medical diagnosis" regarding an alleged offender by identifying the individual's intent based on his conduct. He said that he does not require a particular number of acts before beginning to form such a diagnosis and that a report from a child of inappropriate touching, such as the touching of a child on the upper leg to check the child's temperature, would be enough to raise a question in his mind that he would "want to check out."

On redirect reexamination, the prosecutor asked,

"Doctor, if this individual had been previously convicted of touching many children in exactly the same ways that led to sexual intercourse and sodomy and manipulation of the genitals, would that indicate to you that that individual has engaged in grooming?"

Knapp answered in the affirmative. On recross-examination, Knapp again testified that the combination of a prior history of committing sexual abuse together with the touching on the upper leg and the picking up of a child would be significant facts in deciding whether grooming behavior had occurred. Defense counsel inquired if his opinion would be the same if the earlier "sexual situation" was 14 years in the past, and Knapp replied:

"[T]here are plenty of examples of offenders that molest two or three times in their lifetime and have 20 year spans between incidents of offending behavior, so [I] wouldn't rule it out. I wouldn't rule out a conclusion on my part that this person may have been grooming the child."

At that point in the trial, the prosecutor started to give a lengthy hypothetical example, and defense counsel objected. The trial court overruled the objection. The prosecutor's hypothetical required Knapp to assume that he had before him

---

ask the child, 'Do you mind if I do this?' And the child, who really has no power in the relationship to begin with, doesn't object. And so then, when the sexual molestation follows, the child feels that he or she must have been some kind of partner in this."

"an individual in the context of teaching young females in the past and engaging in picking them up under the armpits in the past and putting his fingers on their upper chest, upper breast area, rubbing their legs, their thighs, which eventually leads to culmination of criminal sexual offenses—sexual intercourse, sodomy and masturbation, touching of the genitals—and this person then is convicted of offenses involving that and sent to prison for a good number of years, and then after release from prison engages in teaching school again and engages in teaching young children of female age, and claims to be interested in finding out how cold or hot the ambient temperature is by touching one of these student's legs on the upper side area twice, to see how cold it is and then to see if the change in the heating apparatus has caused a difference, that person then picks that individual up by the armpits from behind and places his fingers on the person's chest or upper breast area, engages in conduct where he puts his hand on her leg while he is pointing out things, when they're sitting down, school work that's being done; when that individual, in connection with another young female, engages in a process of continually putting his hand on her upper leg in the context of leaning over and pointing things out with regard to school lessons, is told by the second individual that that conduct is not wanted and he still persists—and this is all again in the context of teaching * * *.

"* * * * *

"The last bit of information I'd like you to consider is that the second person advises the school teacher that she's going to report the matter to her mother and the school teacher responds that she better not; if she does, he'll hurt her, he'll hunt her down or haunt her. Based upon all of that information, would you be willing to give us an opinion as to whether or not in your professional opinion you feel that that person has engaged in grooming behavior?"

Dr. Knapp responded, "Yes, I feel that's grooming behavior."

Defense counsel relied on *State v. Hansen*, 304 Or 169, 743 P2d 157 (1987), in support of his argument to exclude Knapp's testimony. He said:

"But the language that I have quoted in the *Hansen* case as far as what is grooming is the only thing that's really been addressed in our appellate courts as of this point, which

describes a process or a technique. As I pointed out in the memorandum, when you look at the pleadings in this case, it doesn't even come close to establishing some kind of grooming.

"Now, the *Hansen* case, of course, said that as far as grooming, the grooming process cannot be simply put forth for the purpose of establishing a bad character or bad acts. * * * Well, based on the indictment which alleges, again, the first type of conduct and then also the touching of the upper leg, it doesn't even come close to this criteria that was quoted in *Hansen* * * *.

"By calling Dr. Knapp what they're basically saying is we're going to tell you how an innocent act performed by anyone could in fact be an act of grooming for sexual purposes. There isn't any support for that based on the pleadings other than the fact that they're alleging a grooming process by touching the upper leg.

"* * * Looking at everything in the record pertaining to [the second child], there is not even a hint of some kind of a grooming here. Her allegation, which [the prosecutor] just mentioned a moment ago, about what he alleges happened on this particular day, and it's also alleged again in paragraph 4, Attempted Coercion, is a hostile, aggressive act that has nothing to do with grooming. So as far as [the second child] is concerned, Dr. Knapp's testimony, based on the pleadings and based on the statements that [the prosecutor] just made to the Court, has nothing to do with the grooming process. And since they were joined, if Dr. Knapp is allowed to testify, it's obviously very possible for the jury to be misled and confused over this issue.

"And of course, the whole idea is to prepare the jury, which I think is an unproven theory. As far as I can tell, it hasn't really been recognized in the medical profession and it has not been really addressed in the courts, and so what they're doing is they're taking in this idea or this concept of grooming, bringing in the Oregon evidence establishing the touching of the upper leg, and then they bring in Dr. Knapp who talks about this theory of grooming, and then they bring in 15 or 14 and a half year old cases involving prior sexual activity. The only purpose and the only obvious conclusion under those circumstances is that they're saying, 'Well, you've got to go back 14 and a half years, members of the jury, and see that this guy did a bad thing back then,

and you can relate that back to what's happened right here, which was not a criminal act.' * * * There's no relevance. * * *"

■    We understand defendant's motion to exclude Knapp's testimony to raise two issues. The first issue is whether Dr. Knapp's testimony about "grooming" is relevant under OEC 401.[2] The second issue is whether the state was required to lay a foundation for the admission of scientific evidence under OEC 702[3] before it could offer Knapp's testimony. As to the latter issue, defendant relies on appeal on the holding in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984).[4] Preliminarily the state argues that any objection under *Brown* was not preserved before the trial court. We disagree because of defendant's reliance at trial on *State v. Hansen*, a case that we will discuss in some detail, because it plays a major role in our subsequent analysis.

In *Hansen*, the defendant, a high school teacher, was charged with engaging in sodomy with one of her students before the student's 16th birthday. The student testified on direct examination and cross-examination that she had for several months initially denied having a sexual relationship with the defendant. Because that testimony called into question the student's credibility, the state offered evidence from a police detective regarding his experience in investigating other child sexual abuse cases. The detective testified over objection that it was normal behavior for child victims of sexual abuse to deny that abuse occurred because they feel

---

[2] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[3] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[4] In *Brown*, the court held that the standards used to determine the admissibility of "scientific evidence" under OEC 401 and OEC 702 are (1) the theory's general acceptance in the field; (2) the expert's qualifications and stature; (3) the use that has been made of the theory; (4) the potential for error; (5) the existence of literature supporting the theory; (6) the novelty of the theory; and (7) the extent to which subjectivity plays a role. 297 Or at 417.

guilty and embarrassed. Often they have an emotional tie to the abuser that motivates them to protect the abuser. The defendant did not challenge that testimony in general but objected to the following question and answer:

> " '[PROSECUTOR:] Now, do you find certain common factors when you work with both the victims and offenders in these non-family cases? Do you find certain factors or methods that an offender will use to get close to the victim?
>
> " '* * * * *
>
> " '[DETECTIVE:] Yes, there are certain techniques. It's usually what I term a 'grooming process.' Usually, there's an extensive amount of testing that goes on both physically and psychologically. There is usually a lot of gift giving, a lot of affection, praising, rewards, anything to make the individual more comfortable even to the extent of dealing with lots of people surrounding this particular person, just getting into a comfortable role; in other words, feeling comfortable and being close to an individual. Yes, they often establish some emotional dependency.' " *Hansen*, 304 Or at 174.

The *Hansen* court held that the grooming evidence in that case was not relevant under OEC 401. It noted that under *Brown*, admissibility of expert testimony must be evaluated in reference to OEC 401. It said:

> "The testimony to which defendant objects did nothing to explain the student's initial denial of sexual relations with defendant. Detective Robson testified that, in his experience, sexually abused children are reluctant to admit the abuse because, in addition to feelings of guilt and embarrassment, they are often emotionally dependent on the adult abuser. That much of his testimony arguably is admissible under [*State v.*] *Middleton*, [294 Or 427, 657 P2d 1215 (1983),] although *Middleton* involved intra-family abuse, because it might assist the trier of fact to understand the student's initial denial. But the specific techniques used by some child abusers 'to get close to the victim' which may result in the child's emotional dependence on the abuser, are irrelevant to the effect the dependence has on the child's willingness to implicate the abuser. It is the emotional dependence, not the specific acts that produce it, that helps to explain the child's behavior. *Middleton* does not support the admission of this testimony." *Hansen*, 304 Or at 175-76.

We hold that defendant has adequately preserved both issues for appellate review. His reliance on *Hansen* in the trial court and his characterizations of "grooming" as an "unproven theory" put the trial court on notice as to the issues framed on appeal. We turn to the merits of the relevance issue under OEC 401.

■    Whether the evidence is relevant under OEC 401 depends on the particular facts of each case and on whether the proffered evidence has a tendency to make a particular fact or contention more or less likely. The holding in *Hansen* that "grooming" evidence was not relevant is not on point as to the facts in this case. In *Hansen*, the relevance of the detective's testimony depended on whether the evidence about grooming could explain the student's initial denial of sexual relations with the defendant. As the court held, the ultimate emotional dependence on the abuser could have been relevant to that issue but the underlying acts that led to that dependence were not. In contrast, the evidence in this case about grooming is the gravamen of the charges against defendant. Defendant's position that his conduct was not intended as grooming behavior puts his intent directly in issue. Evidence that conduct, like that which occurred in this case, falls within the cognizable behavior patterns of sex offenders as steps toward the ultimate completion of sexual abuse makes it more probable that defendant's motivation for his conduct was for his own eventual sexual gratification. We conclude that Knapp's testimony was relevant under OEC 401.

■    The issue regarding whether the state was required to lay an additional foundation for Knapp's testimony turns on whether the testimony given by Knapp is "scientific evidence" within the meaning of *State v. Brown*. In *Brown*, the issue concerned the admissibility of the results of a polygraph examination. The court said:

> "The term 'scientific' as we use it in this opinion refers to evidence that draws its convincing force from some principle of science, mathematics and the like. Typically, but not necessarily, scientific evidence is presented by an expert witness who can explain data or test results and, if necessary, explain the scientific principles which are said to give

the evidence its reliability or accuracy." *Brown*, 297 Or at 407-08.[5]

In *O'Key*, the court elaborated on the meaning of "scientific evidence." In that case, the defendant was charged with driving under the influence of intoxicants, and the issue was the admissibility of a field sobriety test known as the Horizontal Gaze Nystagmus (HGN) test. The test is performed by measuring the angle of onset of nystagmus or involuntary, rapid oscillation of the eyes as a subject looks from side-to-side while tracking a steadily moving object. The scientific proposition on which the test is based is that alcohol affects the involuntary tracking mechanism of the eyes. The court concluded that evidence of an HGN test result is "scientific evidence," because

"[the test] purports to draw its convincing force from a principle of science, namely, the asserted scientific proposition that there is a causal relationship between consumption of alcohol and the type of nystagmus measured by the HGN test[,]" *O'Key*, 321 Or at 296,[6]

in addition to the personal observation of the officer who administers the test.

■ The implication of *O'Key* is that evidence based on personal observations that does not draw its convincing force from a principle of science is not "scientific evidence" within the meaning of *Brown*. As the court in *O'Key* recognized, "it is difficult to set a more definitive boundary between 'scientific' evidence and 'technical or other specialized knowledge,' which are the other types of evidence requiring expert proof." 321 Or at 291. Nonetheless, such a distinction exists, and it is that distinction that drives the result in this case.[7] Thus, our

---

[5] "Although *Brown* focused on 'novel' scientific evidence, [its holding] is not limited to 'novel' scientific evidence." *State v. O'Key*, 321 Or 285, 293 n 9, 899 P2d 663 (1995).

[6] The court explained that, "[t]he value of HGN testing depends critically on the demonstrated scientific validity of that proposition. Moreover, the proposition that alcohol consumption causes nystagmus possesses significantly increased potential to influence the trier of fact as a 'scientific' assertion." *Id.* at 296-97.

[7] In drawing a distinction between "scientific evidence" and "technical or other specialized knowledge," the determining factor is the source of the evidence's reliability or accuracy. The distinction between "scientific evidence" and "specialized knowledge" is illustrated by the ways in which testimony about medical causation is submitted into evidence. For instance, a medical doctor diagnoses a fracture by

inquiry is whether Knapp's testimony derives its force from scientific principles or whether it is merely testimony based on specialized knowledge of an expert in the treatment of sex offenders.

In *State v. Milbradt*, 305 Or 621, 756 P2d 620 (1988), an issue was whether a caseworker who was not an expert on mentally retarded adults could testify on the way child victims normally react to sexual abuse without meeting the *Brown* foundation requirements for scientific evidence. The defendant in *Milbradt* was charged with sexual offenses involving two mentally retarded adults. A caseworker was permitted to testify about the way child sex abuse victims typically react to sexual abuse. The court said:

> "This case deals with two young adults who have had substantially different backgrounds and experiences and who are physically and mentally quite dissimilar to any child victims previously encountered by this witness. * * * We have set out in great detail in *Brown*, 297 Or at 409-18, the necessary foundation that must be laid for the introduction of scientific evidence. Without repeating what we said there, we direct the attention of anyone who is offering a form of scientific evidence to the procedures for admissions set forth in *Brown*. * * *

> "* * * We suggest that in future cases involving 'syndrome' testimony full foundations be established, if indeed it can be shown that the so called 'typical' reactions can be demonstrated to be either typical or reliable. * * *" *Milbradt*, 305 Or at 630-31.

In *State v. St. Hilaire*, 97 Or App 108, 111, 775 P2d 876 (1989), the defendant assigned as error the trial court's admission of a police detective's testimony "that victims of sexual abuse rarely report the crime immediately, often minimize the activity and often are imprecise about the dates of the occurrences." We agreed with the defendant's argument

palpation and observation or by resorting to an x-ray. His testimony about his diagnosis is not "scientific evidence" within the meaning of *Brown*. On the other hand, evidence of a "syndrome" could be "scientific evidence" under some circumstances. In medical parlance, a "syndrome" is "[t]he aggregate of signs and symptoms * * * constituting together the picture of the disease." *Stedman's Medical Dictionary*, 1379 (23d ed 1976). The relationship between the aggregate of signs and symptoms may be what gives reliability to the conclusion that a syndrome exists, and that relationship may be demonstrable only by a comparative analysis of test data.

that "sex abuse syndrome" testimony is only admissible if an appropriate foundation is laid under *Brown* and *Milbradt*. In *St. Hilaire*, the officer's testimony was offered to rebut an inference that the victim's testimony was not credible. Thus, the detective's testimony was offered to explain the state of mind of sex abuse victims with regard to reporting the abuse or, in other words, the psychological condition of sex abuse victims. We concluded that the state had laid a proper foundation for the detective's testimony and that his testimony was relevant to rebut the defendant's theory.

In *State v. Lawson*, 127 Or App 392, 872 P2d 986, *rev den* 320 Or 110 (1994), the defendant, charged with assault and criminal mistreatment of infants in her care, offered testimony by a psychologist that she did not meet the profile of a child abuser because she had a low propensity for violence and because she controlled her temper. Also, she relied on psychological testing that indicated that she did not have the psychological characteristics of known, active child abusers. We relied again on the holdings in *Brown* and *Milbradt* and required that the defendant satisfy the *Brown* requirements. We explained:

> "[T]he type of evidence proffered by defendant in this case involves comparing an individual's behavior with the behavior of others in similar circumstances who have been studied in the past. This comparison evidence purports to draw its convincing force from scientific principles. It requires an expert witness who can explain the data and test results, and, if necessary, the scientific principles that are said to give the evidence its reliability or accuracy." *Id.* at 395.

We conclude that the holdings of *Milbradt, St. Hilaire* and *Lawson* do not control the admissibility of the evidence in this case. They were concerned with the admissibility of the evidence of the psychological picture of sexual abuse victims or individuals who physically abuse children. The testimony here was offered to prove the state's charges and to assist the jury in understanding the significance of defendant's actions toward the victims, actions that otherwise might be considered innocent behavior. "Evidence of a defendant's intent is rarely, if ever, proven by direct evidence. Intent is an operation of the mind, and it is seldom

susceptible of direct proof." *State v. Rose*, 311 Or 274, 282, 810 P2d 839 (1991). In this case, the state was required to prove that the touching occurred with a criminal intent. Knapp's general testimony about the methods that sex offenders use to prepare their victims for eventual abuse has nothing to do with providing a psychological picture of defendant as an abuser or his credibility. Rather, it provides evidence from which the jury could infer that defendant acted for a sexual purpose, an element of the crime. Most importantly, the force of Knapp's observations is not drawn from psychological testing or any other scientific methodology; rather, his testimony is derived from personal observations made in light of his education, training and experience, not unlike any other expert witness who testifies from technical or other specialized knowledge.[8] In that light, we conclude that Knapp's testimony was not "scientific evidence" within the meaning of *Brown* but evidence based on "specialized knowledge."

Defendant's second assignment of error is related to his first assignment of error. The trial court ruled that the testimony of three of the witnesses from California was admissible as evidence of prior bad acts to show defendant's intent at the time of the alleged crimes against the victims in this case. OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

On appeal, defendant argues that he "would have difficulty arguing with the relevance theory of the state, but for the fact that the California acts are so remote." In light of Dr. Knapp's testimony that "there are plenty of examples of offenders that molest two or three times in their lifetime and have 20 year spans between incidents of offending behavior," the hiatus between the California acts and the incident in

---

[8] To the extent that our decision in *St. Hilaire* can be read to stand for more than a rule of law regarding the admissibility of evidence concerning a victim's or a defendant's psychological condition, we disavow any such interpretation.

this case does not render the evidence irrelevant. Defendant also argues that prejudicial effect of the testimony from the California victims outweighs any probative value. The trial court went through all of the necessary inquiries under *State v. Johns,* 301 Or 535, 725 P2d 312 (1986), to determine whether the evidence was relevant and whether its prejudicial effect substantially outweighed its probative value. The trial court found the evidence "very, very, strong." It noted that all of the California victims were young girls in a student-teacher relationship with defendant and that the characteristics of defendant's actions at that time were similar to his conduct in this case. The court also concluded that the state needed the evidence in light of defendant's position that the touchings of the victims in this case were innocent. Additionally, the court instructed the jury in a manner to make it unlikely that the jurors would misuse the evidence. We conclude that the trial court's ruling that the probative value of the evidence outweighed the potential for unfair prejudice was proper and was not an abuse of discretion.

Assignments of error three and four do not warrant a detailed discussion. Suffice it to say that the evidence taken in the light most favorable to the state demonstrates that defendant took substantial steps toward abusing the victims. Whether the events occurred as the victims described them was a question of fact for the jury to decide, and there is evidence in the record to support each element of the charges. Finally each time defendant touched the first victim's leg, he committed attempted sexual abuse because he had the opportunity to pause and reflect on his conduct. ORS 161.067.[9] Thus, consecutive sentences were lawfully imposed

---

[9] ORS 161.067 provides, in pertinent part:

"(1) When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations.

"* * * * *

"(3) When the same conduct or criminal episode violates only one statutory provision and involves only one victim, but nevertheless involves repeated violations of the same statutory provision against the same victim, there are as many separately punishable offenses as there are violations, except that each violation, to be separately punishable under this subsection, must be separated from other such violations by a sufficient pause in the defendant's

because he had the time to renounce his criminal objectives before acting further. Defendant's other arguments and assignments of error do not warrant discussion or we do not have an adequate record to review them.

Affirmed.

Warren and Haselton, JJ., join in this opinion.

**DEITS, C. J.,** concurring.

I agree with the majority that defendant preserved the argument that the state failed to establish an adequate foundation under *State v. Brown*, 297 Or 404, 687 P2d 751 (1985), for the admission of Dr. Knapp's testimony. I also agree that the disputed evidence is relevant under OEC 401. My disagreement with the majority is with its holding that this is not "scientific evidence" as those terms are used in *Brown*. For the reasons discussed in Judge Landau's dissent, in my view, we are compelled by existing case law to hold that this is scientific evidence and that an adequate foundation under *Brown* must be established for the admission of the evidence at issue here. However, as I will explain, it is my position that the case law establishes that *Brown* is to be applied in a flexible manner depending on the nature of the particular evidence. Applying the *Brown* factors here in that manner, I would hold that an adequate foundation was established.

As noted above, I believe that Judge Landau is correct that the Oregon Supreme Court and this court have clearly held that psychological evidence, similar in nature to the evidence presented here, should be evaluated as 'scientific evidence' for purposes of admissibility under *Brown*. *State v. Milbradt*, 305 Or 621, 756 P2d 620 (1988); *State v. Stevens*, 147 Or App 592, 599, 938 P2d 780 (1997), *rev allowed* 326 Or 57 (1997); *State v. Lawson*, 127 Or App 392, 872 P2d 986, *rev den* 320 Or 110 (1994); *State v. St. Hilaire*, 97 Or App 108, 112, 775 P2d 876 (1989). The majority attempts to distinguish the holdings in the above cases on the basis that Knapp's testimony here is offered for a different purpose and that the force of Knapp's observations does not

criminal conduct to afford the defendant an opportunity to renounce the criminal intent. * * *"

flow from psychological tests or other scientific principles, but from observations made in light of his training and experience. In my view, however, under the existing case law, this distinction does not lead to the conclusion that the *Brown* factors do not apply. Instead, this difference dictates how the *Brown* factors should be applied.

I would begin by emphasizing that, in applying the *Brown* test, the focus should not be on assessing the correctness of the scientific proposition that is being offered; that is a task for the trier of fact. Rather, the focus of the *Brown* inquiry should be on the scientific methodology underlying the scientific proposition. Scientific methodology involves "validation technique[s], consisting of the formulation of hypotheses, followed by observation or experimentation to test the hypotheses." *State v. O'Key*, 321 Or 285, 292, 899 P2d 663 (1995). This court appeared to agree that scientific methodology was the proper focus when applying the Brown factors in our decisions in *Jennings v. Baxter Healthcare Corp.*, 152 Or App 421, 428, 954 P2d 829, *rev allowed* 327 Or 317 (1998):

> "[The seven *Brown* factors] are to be used to help the court to determine whether the *methodology* underlying the scientific evidence is sufficiently reliable. Moreover, the *Brown* factors focus on whether scientific evidence has a level of reliability sufficient for it to have probative value and are *not* to be used to determine whether 'the evidence reflects or rests on a certain or indisputably correct scientific proposition.' *Boger v. Norris & Stevens, Inc.*, 109 Or App 90, 93, 818 P2d 947 (1991), *rev den* 312 Or 588 (1992)." (Emphasis in original.)

It is also important to recognize, as the majority does, that the *Brown* test was developed with more traditional scientific evidence in mind and, as a consequence, the application of the test to psychological evidence is not a precise fit. For example, four of the *Brown* factors use the terms "technique" or "invention." The proffered evidence here, of course, does not involve a "technique" or "invention." Rather, the evidence here consists of generalizations about human behavior made by a person trained in assessing particular kinds of human behavior. In the words of Knapp, the witness

offering the disputed evidence here, grooming is "a description of a pattern of behavior that offenders generally go through, some more than others."

The court in *Brown*, and in subsequent cases, appears to have recognized these incongruities in the application of *Brown* to psychological evidence by declaring that the *Brown* test is not a mechanical test for the admission of scientific evidence and in its admonition that the test should be applied in a flexible manner, depending on the characteristics of the particular evidence. *O'Key*, 321 Or at 300; *Brown*, 297 Or at 417-18. I would hold that, in applying the *Brown* test to psychological evidence, we need to take into account the nature of the particular evidence and, in particular, to focus on the methodology used to develop the evidence.

The manner in which I would apply the *Brown* factors differs from that used by Judge Landau in that his major focus is on the validity of the *theory* being offered by the expert here, which he labels as "grooming," rather than on the scientific *methodology* that Knapp used to develop this theory. Judge Landau appears to consider grooming to be the "technique" or "invention" that we are evaluating and concludes that the *Brown* factors are not satisfied here because there is no evidence of the general acceptance of grooming as a technique, no evidence about the use that is made of grooming, the potential rate of error of grooming or the novelty of the use of the concept of grooming. Grooming, however, is the scientific theory here. In my view, we should evaluate *how Knapp arrived at the premise* that there is a generalized pattern of behavior called grooming. If the scientific methodology used in arriving at this theory is sound, and the evidence otherwise satisfies the relevancy test, it is for the trier of fact to determine the weight to be given to the evidence. *OKey*, 321 Or at 322.

This court used the above approach in applying the *Brown* factors to this type of evidence in *St. Hilaire*. That case involved the question of the admissibility of testimony by a police officer who specialized in sex abuse cases regarding typical behavior by child victims of sexual abuse. The witness offering the evidence in *St. Hilaire*, Robson, had worked for 14 years investigating crimes involving child abuse and child

sexual exploitation. He had received extensive training on the subject of sexual abuse of children and had interviewed personally over 400 alleged sex abuse victims. The court in *St. Hilaire* noted at the outset that the *Brown* factors should serve as "guidelines," not as a checklist. It then explained its application of *Brown*:

"In testifying about the typical behavior of sexually abused children, Robson merely drew observations from his extensive experience interviewing them. He was clearly qualified to do that. Moreover, because most of the children whom he had interviewed were known to have been abused, there was a low potential for error in his observations. Finally, because the testimony consisted of Robson's factual observations, there was little room for subjective interpretation on his part.

"It is true that the state might have offered evidence on the existence of *specialized literature* in the field of the behavior of child abuse victims. Given that Robson's testimony was based on first-hand experience, however, that foundation was unnecessary. None of the remaining *Brown* criteria applies to the type of testimony offered here." *St. Hilaire*, 97 Or App at 113 (emphasis added).

A similar analysis is appropriate here. Defendant does not dispute that Knapp was an expert. Knapp has a masters' degree in clinical psychology and has been licensed as a clinical psychologist in Oregon since May 1984. He has had specialized training in the treatment of persons who have been charged with or convicted of sexual crimes and has worked with sexual offenders during that time conducting group therapy, individual therapy and making psychological assessments of offenders. He has continued to take courses in the field of sexual abuse, has written on sex abuse issues and has testified on such issues. He testified that he presently is working in an offender treatment program. He explained:

"I have a treatment program in Ashland that has about 40 adult males involved in it at this time. The program is a two to three year program. It involves getting the person to make full disclosure about their sexual history, working with them to help them understand their high risk situation—thoughts, feelings and behaviors—that are antecedent, or come before, sexually acting out. It helps them understand the side of themselves that perhaps many of

them don't want to acknowledge, that leads them into doing this kind of offense in the first place. For example, personality characteristics like being self-centered, not looking at consequences to one's actions, those kinds of things."

Knapp's testimony regarding the pattern of behavior that he describes as grooming was drawn from his observations based on his training and personal experience. He was clearly qualified to so testify. Knapp's testimony consisted mostly of factual observations about the behavior of sexual offenders. Although Knapp's generalizations included some subjective interpretation, for the most part, his testimony consisted of objective observations of certain behavior that he had observed in sexual offenders. The technique used to develop Knapp's proposition, namely, observation and assessment of sexual offenders by a person with training and experience, is certainly a well-accepted method of developing psychological evidence. As with most techniques associated with psychological evidence, this technique does not readily lend itself to providing objective, empirical data on which to base a potential rate of error, as do more traditional scientific tests. There likely is specialized literature on the subject of grooming, but none was introduced here. The *Brown* factor regarding the "novelty of the invention" is not particularly meaningful here, as we are not evaluating an invention.

After considering the above factors, and in view of the nature of this evidence, I would hold that an adequate foundation has been established under *Brown* for the admission of the evidence. Further, as noted above, I agree with the majority that the evidence is relevant under OEC 401. The remaining question is whether the evidence, even though relevant, should be excluded under OEC 403, because it is unfairly prejudicial. The application of OEC 403 was explained by the court in *Brown*:

"This rule requires trial courts and, in some cases, appellate courts to evaluate the degree to which the trier of fact may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence, thereby leading the trier of fact to abdicate its role of critical assessment. *See* 3 Weinstein's, *supra* 702-19." 297 Or at 439.

The court in *Brown* went on to conclude that because polygraph evidence has "an aura of scientific infallibility" and goes directly to the essence of the trial process, namely, the truthfulness of the witnesses and the defendant, it must be excluded as unfairly prejudicial.

In evaluating here whether the trier of fact will be overimpressed by the disputed evidence, again I believe that we need to take into account the nature of this evidence. In particular, we should consider the difference between the impact of psychological evidence versus more traditional scientific evidence. The impact of more traditional scientific evidence, or what is often referred to as "hard scientific" evidence, is discussed by one commentator.[1]

"The particular concern about juries and 'hard' scientific evidence traditionally covered by the *Frye* test is that juries are not in a position to fairly and intelligently weigh evidence when the key to understanding the evidence is locked up in some inscrutable device or process which cannot be cross-examined. Additionally, the evidence by its 'scientific' nature may tend to elicit unquestioning juror acceptance. Where the jury is in the position of either being virtually compelled to accept the validity of the evidence because it cannot effectively be cross-examined or irrationally wanting to believe the evidence simply because it appears to be unassailably 'scientific', the *Frye* test seeks to assure that the evidence is reliable. The general acceptance by the scientific community serves to compensate for the jury's inability to fairly weigh the evidence by at least assuring that the jury is not likely to be misguided by placing reliance on the evidence." David McCord, *Syndromes, Profiles and Other Mental Exotica: A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases,* 66 Or L Rev 19, 85 (1987).

While juries likely do give some deference to psychological evidence, such evidence does not consistently have the

---

[1] These comments were made in the context of discussing the acceptability of the *Frye* test. However, the point of the discussion regarding the impact of "hard scientific evidence" on the jury is equally applicable here.

same effect on jurors as hard scientific evidence. Psychological evidence generally is not information that a juror is compelled to accept because it is inscrutable and difficult to cross-examine. Psychological evidence is most often derived from observations of human behavior. Jurors often may draw, at least to some extent, from their own life experience in assessing the reliability of such evidence and meaningful cross-examination is often available to assist the trier of fact in assessing the reliability of the evidence.

As the court explained in *O'Key*, "unfair prejudice" under OEC 403 does not mean that the evidence is harmful to a party's case:

> "In the context of OEC 403, 'unfair prejudice' does not mean 'evidence is harmful to the opponent's case—a central reason for offering evidence.' [*State v.*] *Hampton*, 317 Or [251,] 259 n 15, [855 P2d 621 (1993)]. Rather, it means an undue tendency to suggest a decision on an improper basis, commonly although not always, an emotional one. *State v. Pinnell*, 311 Or 98, 105-06 n 12, 806 P2d 110 (1991). 'Unfair prejudice' describes a situation in which the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish the fact of consequence." 321 Or at 321.

I would hold that the evidence here is not unfairly prejudicial. The existence of a pattern of behavior—labeled as grooming—provides one possible explanation for defendant's acts of touching the alleged victims. Knapp never testified that defendant did engage in grooming. Rather, he described grooming as a general pattern of behavior and indicated that whether the pattern existed in a particular case must be determined based on the "context of the situation." As recognized by the court in *O'Key*, the jury is capable of evaluating such evidence. 321 Or at 305. For all of the above reasons, I would hold that the trial court properly admitted Knapp's testimony.

Armstrong, J., joins in this opinion.

**WARREN, J.,** concurring.

I agree with the majority opinion in this case. However, I write separately because I do not think that it fully

recognizes the limited occasions when the *Brown* test applies. *See State v. Brown*, 297 Or 404, 687 P2d 751 (1984). In my opinion, the *Brown* test applies only when the methodology for gathering scientific evidence is novel. In other words, it applies to scientific testing techniques or inventions that lead to expert conclusions. In contrast, it does not apply to "syndromes" or "profiles" that are based on human observation and study. While these syndromes or profiles might be "novel evidence" they are not based on a novel methodology for gathering the evidence. This restriction on the need to use the *Brown* test is evident from the test itself.

In *Brown*, the court listed seven factors that are to be considered in determining the relevance or probative value of proffered scientific evidence under OEC 401 and OEC 702:

"(1)  The *technique's* general acceptance in the field:

"(2)  The expert's qualifications and stature:

"(3)  The use which has been made of the *technique*;

"(4)  The potential rate of error;

"(5)  The existence of specialized literature;

"(6)  The novelty of the *invention*; and

"(7)  The extent to which the *technique* relies on the subjective interpretation of the expert." 297 Or at 417 (emphasis added).

Of those factors, three refer to a "technique" and one refers to an "invention." The obvious question in this case is: what technique or invention? The technique or invention could not be the act of "grooming" by defendant because, in this case, technique or invention necessarily refers to something employed by the expert to formulate conclusions about "grooming." Certainly, the *Brown* criteria are not easily applied to a syndrome or a profile analysis where there is no new methodology, technique or invention. Rather, a syndrome or profile determination is only a conclusion based on human observation and study by persons specially trained to draw such conclusions.[1] Although we have felt compelled to

---

[1] In *Brown*, the court pointed out that those seven factors were not the only factors that could be considered. It listed 11 additional factors, borrowed from Justice McCormick in *Scientific Evidence: Defining a New Approach to*

massage the *Brown* test so that certain syndromes appear to fall within it, *see State v. St. Hilaire*, 97 Or App 108, 775 P2d 876 (1989) (applying the *Brown* test to "sex abuse syndrome"), we should not compound that error here.[2] The *Brown* test should be used only where the relevancy question is based on novel methods of gathering evidence, not simply on novel evidence.

### DE MUNIZ, J., dissenting.

I agree with the lead opinion that Knapp's testimony here was not scientific evidence. However, I also agree with Judge Landau's position that the testimony should not have been admitted and requires reversal, although I do not agree with his analysis leading to that conclusion.

In my view, it is unnecessary to reach the dispute as to whether the evidence was scientific evidence. Irrespective of whether the offered testimony is deemed evidence based on "specialized knowledge" or "scientific" evidence, the first question to resolve is whether the evidence is relevant. Unlike the lead opinion, I conclude that it is not.

The Supreme Court noted in *State v. Hansen*, 304 Or 169, 175, 743 P2d 157 (1987):

"In *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), this court explained that the admissibility of expert testimony must be evaluated in essentially the same manner as other evidence, with particular reference under OEC 401 to the testimony's relevance and under OEC 403 to the danger that the testimony might unfairly prejudice the opposing party. *Id.* at 409, 415-18."

And in *State v. O'Key*, 321 Or 285, 298, 899 P2d 663 (1995), where the issue was the admissibility of the "scientific" evidence of the nystagmus test, the court reiterated that the first step in determining admissibility is relevance:

---

*Admissibility*, 67 Iowa L Rev 879, 911-12 (1982). Each of those 11 factors directly or indirectly refers to a "technique." *Brown*, 297 Or at 417-18 n 5.

[2] I recognize that the Supreme Court has suggested that "syndrome" or "profile" evidence must satisfy the *Brown* test. *See State v. Milbradt*, 305 Or 621, 630, 756 P2d 620 (1988) (suggesting in *dictum* that syndrome evidence must meet the *Brown* test). However, that court has not been called on actually to apply the *Brown* test to syndrome evidence.

*"Once the testimony is determined to be relevant* under OEC 401, helpful under OEC 702, and not barred by OEC 402, it will be excluded only if its probative value is substantially outweighed by one or more of the countervailing factors set forth in OEC 403[.]" (Emphasis added.)

In *Hansen,* the defendant, a high school teacher, was indicted for sodomy with one of her students. 304 Or at 171. On direct examination, the student testified to originally denying sexual relations with the defendant. *Id.* at 173. To explain the student's initial denial, the state then presented the "expert" testimony of Detective Robson, who testified, based on his experience in investigating child sexual abuse cases, that offenders engaged in a "grooming process" and what that process included. *Id.* at 174.[1]

On appeal, the Supreme Court held that Robson's testimony "did nothing to explain the student's initial denial of sexual relations with defendant":

"The only other possible ground [on which the evidence would be admissible] would be as evidence that defendant had sexual relations with the student, but the relevance of the testimony for this purpose is practically nil. Detective Robson testified to what might be described as a 'profile' of a nonviolent child abuser who is unrelated to the child: physical and psychological 'testing' of the child, giving gifts, showing affection, praising, making the child feel comfortable in the abuser's presence, etc. That child abusers use these techniques has no bearing on whether a person who does these things is a child abuser." *Id.* at 175-76.

I am not persuaded by the lead opinion that that reasoning does not apply here. Knapp testified that, in preparing a child for "sexual victimization," the offender gets close to the child, creates a relationship, buys gifts, becomes a confidante and engages in "varying degrees of touching." The only relevance

---

[1] Robson testified:

" 'Yes, there are certain techniques. It's usually what I term a "grooming process." Usually, there's an extensive amount of testing that goes on both physically and psychologically. There is usually a lot of gift giving, a lot of affection, praising, rewards, anything to make the individual more comfortable even to the extent of dealing with lots of people surrounding this particular person, just getting into a comfortable role; in other words, feeling comfortable and being close to an individual. Yes, they often establish some emotional dependency.' " 304 Or at 174.

of that testimony was as evidence that defendant's touching was sexual. However, as in *Hansen*, that abusers engage in touching as part of their grooming has no bearing on whether defendant is an abuser.

The state contends, however, that *Hansen* "does not mean that an expert may never describe techniques used by offenders to break down resistance[.]"[2] Even if that is so, that observation does not negate that, under *Hansen*, evidence that sexual abusers use a "grooming process" is not automatically relevant in a case alleging sexual abuse. Such evidence, without more, permits the inference that, because a defendant engaged in acts that sexual child abusers engage in, the defendant is a sexual abuser. *Hansen*, 304 Or at 176. That inference is "unwarranted." *Id*.

Defendant argues here that the state did not show how his behavior was connected to the grooming process, and I agree. Knapp's testimony as to general characteristics of "grooming" behavior permitted the jury to make an unwarranted inference that, if defendant engaged in any of that behavior, he was a sexual abuser. It was error to allow Knapp's testimony, and the error was prejudicial. Accordingly, I agree with Judge Landau's conclusion that the trial court's decision should be reversed.

Wollheim, J., joins in this dissent.

**LANDAU, J.,** dissenting.

I would hold that the testimony of Dr. Knapp is inadmissible. In my view, the lead opinion wrongly concludes that the admissibility requirements of *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), do not apply. They do apply, as the decisions of the Supreme Court and this court readily demonstrate. Moreover, and contrary to the conclusion of Chief Judge Deits's concurring opinion, those admissibility requirements have not been satisfied on the record developed by the state in this case. I therefore would reverse and remand, and,

---

[2] The trial court held that *Hansen* did not apply, stating that the testimony there was "a police officer in the county as to his off-hand opinion as to what items of grooming could be considered," whereas in this case Knapp's testimony was by a "properly credentialed expert." However, the court in *Hansen* did not address the officer's credentials but, rather, the relevance of the testimony.

from the decision of this court to the contrary, I respectfully dissent.

I begin with the question whether *Brown* applies to Knapp's testimony. The state's questioning of Knapp was relatively brief. It elicited from him that he is a licensed clinical psychologist, that he received specialized training in the treatment of people who have been charged with or convicted of sexual crimes, that he has published at least one article on treating sexual offenders, that he is a member of the Association for the Treatment of Sexual Abusers, that he has testified in court on a number of occasions on the subject of sexual abuse, that he reads professional journals to keep up on developments in the treatment of sexual offenders, and that he runs a treatment program for approximately 40 male offenders. With that foundation, Knapp then testified as follows:

"Q.  Based on your training and experience on the issue of sexual abuse and sexual offenders, is there a concept that you're aware of that's known as grooming?

"A.  Yes.

"Q.  And could you please explain to this jury what that concept is and what it entails?

"A.  When an offender prepares a child for ultimate sexual victimization, he has to get close to the child and create a relationship with the child. And grooming is the term that's used to describe this behavior on the offender's part, of getting close to a child, making friends with the child, becoming perhaps a confidant of the child, getting the child used to certain kinds of touching, play activities. Most offenders that I know groom with relationship; that is, they become a confidant, friend, close associate of the child, do many things with the child, buy them gifts. Many of them expose the child to varying degrees of touching that is non-sexual in nature, but eventually leads up to sexual touching; touching on the legs, the arms, back rub, applying suntan lotion, often using legitimate reasons like that for the touching.

"Also, in grooming there's this concept that the offender very subtly oftentimes leads the child into feeling somehow responsible. Some offenders might

ask the child, Do you mind if I do this? And the child, who really has no power in the relationship to begin with, doesn't object. And so then, when the sexual molestation follows, the child feels that he or she must have been some kind of partner in this."

On cross-examination, defendant asked if what Knapp described as "grooming" constituted a technique or a theory. Knapp explained that "[i]t's just a description for a pattern of behavior that offenders generally go through, some more so than others." He further explained that grooming "always needs to be interpreted in the context of a situation," including the offender's history, the child's age and sex, the location of any touching, and the circumstances of that touching.

On redirect, the state expanded on that point and asked whether, if the individual in question previously had been convicted of sexual assault following preliminary, ostensibly nonsexual, touching, then such information would indicate that the individual later engaging in the same sort of ostensibly nonsexual touching in fact has engaged in grooming. Knapp replied, "yes."

On further cross-examination, defendant questioned Knapp about that point, asking whether it made any difference whether the prior conviction was very old. Knapp replied that he would consider that fact. He then elaborated:

"I think that conclusions in this matter are not either or. I mean, they're not either 100 percent or zero. I think they're tentative, always, because prediction of this kind of behavior or interpretation of this kind of behavior is an interpretation based on the context of the situation in which it occurred, as I have elaborated."

The state then pursued the matter further, posing to Knapp a fairly detailed hypothetical situation and asking him whether he would consider that to constitute grooming behavior. When Knapp answered in the affirmative, the state concluded its examination.

The lead opinion holds that the foregoing testimony does not implicate the admissibility requirements of *Brown*, because what Knapp said was not "scientific evidence."

According to the lead opinion, "scientific evidence" does not include evidence that is "based on personal observations that does not draw its convincing force from a principle of science." 157 Or App at 455. I cannot accept that statement of the law for two reasons. First, it is a bald tautology—scientific evidence is what draws its convincing force from science—and is essentially meaningless. I can only imagine the difficulty the bench and practicing bar will have in applying the holding of lead opinion in future cases. Second, and apart from that, I can find no support in the case law for the lead opinion's statement of the applicable law. So far as I can tell, it rests entirely on a revisionist reading of the relevant decisions of the Supreme Court and this court.

In *Brown*, the Oregon Supreme Court held that, before "scientific" evidence may be admitted, the trial court must

> "identify and evaluate the probative value of the evidence, consider how it might impair rather than help the fact-finder, and decide whether truthfinding is better served by exclusion or admission." *Brown*, 297 Or at 409.

The court did not define precisely what is "scientific" evidence and, hence, subject to that foundational inquiry. The Supreme Court addressed that problem in *State v. O'Key*, 321 Or 285, 291-93, 899 P2d 663 (1995), explaining:

> "This court's definition of 'scientific' evidence in *Brown* recognizes that it is difficult to set a more definitive boundary between 'scientific' evidence and 'technical or other specialized knowledge,' which are the other types of evidence requiring expert proof. As Professors Mueller and Kirkpatrick state:
>
> > " 'Most expert testimony rests at least partly on science. In many areas the scientific underpinning is well established and the criteria set out in [Rules] 702 and 703 work well. The requirements are essentially three: The witness must qualify as an expert, his testimony must be helpful ([Rule] 702), and he must have an adequate basis for what he says ([Rule] 703). Under these criteria, an enormous amount of conventional scientific evidence is routinely admitted.' Christopher B. Mueller & Laird C. Kirkpatrick, *Modern Evidence* § 7.8, 990 (1995).

"Evidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power. The function of the court is to ensure that the persuasive appeal is legitimate. The value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert. * * * *Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should be supported by the appropriate scientific validation.* * * *

"* * * * *

"We need not attempt precisely to distinguish 'scientific' from other types of expert testimony under the Oregon Evidence Code. For now, we hold that, in the absence of a clear case, a case for judicial notice, or a case of *prima facie* legislative recognition, trial courts have an obligation to ensure that proffered expert scientific testimony that a court finds possesses significantly increased potential to influence the trier of fact as 'scientific' assertions is scientifically valid." (Footnotes omitted; brackets in original; emphasis added.)

Thus, contrary to the lead opinion's reading of the cases, whether expert testimony relies on some "scientific" proposition, technique, or formula is not the point. It is, as the court explained, whether the jury likely will *perceive* the testimony to have a basis in science and thereby regard it with enhanced persuasive force. *Id.* at 292-93.

Consistent with that general principle, the cases of both the Supreme Court and this court have required that testimony concerning psychological "syndromes" or "profiles" must satisfy the requirements of *Brown*. For example, in *State v. Milbradt,* 305 Or 621, 631, 756 P2d 620 (1988), the court held that the testimony of an expert about the way child victims normally react to sexual abuse was "scientific evidence" and implicated the admissibility requirements of *Brown*. Similarly, in *State v. St. Hilaire,* 97 Or App 108, 112-13, 775 P2d 876 (1989), the state's expert testified about the behavior of children who were victims of child abuse based on his observations of others in similar circumstances. We held that the testimony was subject to the admissibility requirements of *Brown*. So also in *State v. Lawson,* 127 Or App 392,

395, 872 P2d 986, *rev den* 320 Or 110 (1994), we held that expert testimony concerning the extent to which defendant's behavior was consistent with traits the expert had observed in many other child abusers was scientific evidence that implicated the requirements of *Brown*.

In my view, Knapp's testimony is indistinguishable from the testimony in *Milbradt, St. Hilaire,* and *Lawson.* It is testimony that compares the behavior of an individual with the observed behavior of other individuals with an assumed shared trait. The jury is likely to ascribe special persuasive force to the expert's characterization of the behaviors. *Brown,* therefore, must be satisfied.

The lead opinion attempts to distinguish each of the foregoing cases by recasting them as dependent upon the offering of "syndrome" evidence, which the lead opinion defines as the aggregate of signs and symptoms that constitute a "picture of the disease." 157 Or App at 455 n 7 (quoting *Stedman's Medical Dictionary,* 1379 (23d ed 1976). In other words, the majority attempts to distinguish the cases merely by appending a label to them. The label, however, has no independent significance. As we said in *Lawson:*

> "Whether it is labeled a 'syndrome' or a 'profile,' the type of evidence proffered * * * in this case involves comparing an individual's behavior with the behavior of others in similar circumstances who have been studied in the past." 127 Or App at 395.

That is precisely what Knapp testified to in this case, in which he compared defendant's behavior with the behavior of others he had observed in the past.[1]

Even accepting the lead opinion's description of the cases, the testimony in this case still would be subject to *Brown.* According to the the lead opinion, *Milbradt, St. Hilaire,* and *Lawson* are distinguishable because "[t]hey were concerned with the admissibility of the evidence of the psychological picture of * * * individuals who physically

---

[1] Even the state acknowledges that, in arguing that *Brown* does not apply to Knapp's testimony, it is swimming against the current of the case law. The state goes so far as to suggest that one case, *St. Hilaire,* simply should be overruled.

abuse children." 157 Or App at 457. That, once again, is precisely the nature of Knapp's testimony. The state itself acknowledges that Knapp's testimony was offered merely to provide "[g]eneral background information about how sexual abusers" go about physically abusing children.[2] It is, in other words, the very "psychological picture" that—by the lead opinion's own characterization of the case law—is subject to the admissibility requirements of *Brown*.

I turn, then, to the extent to which the foundational requirements of *Brown* were in fact met. In *Brown*, the Supreme Court explained that, in evaluating the foundation for the admissibility of scientific evidence, trial courts must consider the following factors:

"(1)   The technique's general acceptance in the field;

"(2)   The expert's qualifications and stature;

"(3)   The use which has been made of the technique;

"(4)   The potential rate of error;

"(5)   The existence of specialized literature;

"(6)   The novelty of the invention; and

"(7)   The extent to which the technique relies on the subjective interpretation of the expert." 297 Or at 417.

The court also observed, in a footnote, that other factors may be relevant, including the analogy to other scientific techniques whose results are admissible, presence of safeguards in the characteristics of the technique, the nature and breadth of the inference adduced, the clarity and simplicity with which the technique can be described, and the availability of other experts to test and evaluate the technique. *Id.* at 417-18 n 5. The factors are designed to serve as a guide in

---

[2] At trial, the state similarly defended the admissibility of Knapp's testimony on the ground that it provided a picture of the process of grooming generally as the context for defendant's actions in this case:

"[G]enerally speaking, people [*i.e.*, sex abusers] don't all of a sudden run up to somebody and start fondling them. They engage in a slow process many times that involves grooming them, that involves maybe not touching that is liked, but touching that's inappropriate that eventually leads to more serious touching, which is indeed exactly what this man * * * was leading up to in this particular case."

evaluating the evidence. *Id.* They are not, however, a checklist; not all factors must be satisfied for the evidence to be admissible. *Id.*; *see also St. Hilaire*, 97 Or App at 112 ("The factors are guidelines, not a checklist.").

Turning to Knapp's actual testimony, I conclude that the foundation fails to satisfy the requirements of *Brown*. First, there was no testimony from anyone about the general acceptance of "grooming" as a descriptive term within the field. Knapp testified that it is "just a description for a pattern of behavior that offenders generally go through, some more so than others." Knapp did not testify about who uses the description, whence it originated, on what basis it was developed or whether it is generally accepted in any field of inquiry. Second, there was no testimony about the use that is generally made of the technique. Once again, the only testimony is that Knapp uses the term as a description for a pattern of behavior. Third, what testimony there was in this case about the potential rate of error does not favor admissibility. Knapp testified that his conclusions about whether certain behavior may constitute "grooming" are "tentative, always, because prediction of this kind of behavior or interpretation of this kind of behavior is an interpretation based on the context of the situation in which it occurred." Fourth, there is no evidence of any specialized literature on the subject of grooming behavior. The only testimony about professional literature is that Knapp wrote a single article on an unspecified topic related to treatment of sex offenders and that Knapp reads unspecified journals on the general subject of sex offender treatment. Fifth, there is no testimony about the novelty of the use or application of the behavior classification that Knapp described. Sixth, Knapp's testimony was that the classification of grooming behavior was subjective and based almost entirely on the interpretation of an expert in light of the unique circumstances of each case. In short, the only *Brown* factor that favors the admissibility of the evidence is that Knapp was an expert in the field of sex offender treatment. All other *Brown* factors weigh against admissibility.

Judge Deits's opinion insists that, even assuming *Brown* applies, under our decision in *St. Hilaire*, Knapp's testimony is admissible. I disagree. At issue in *St. Hilaire* was the admissibility of testimony about an expert's personal

observations that certain behavior is typical of child sex abuse victims. He based that testimony on his interviews of 400 alleged victims of abuse, 85 to 90 percent of whom were known to have been abused. We held that the testimony was admissible under *Brown*, "[m]ost significantly, [because the expert] had personally interviewed over 400 alleged sex abuse victims" who were known empirically to have been abused. *St. Hilaire*, 97 Or App at 112-13. In testifying about the behavior typical of abused children, we noted, the expert "merely drew observations from his extensive experience interviewing them." *Id.* at 113.

In contrast, there is no such record in this case. Knapp testified that grooming is "just a description for a pattern of behavior that offenders generally go through, some more so than others." The state elicited from Knapp no foundation for that testimony. There was, most significantly, no evidence that it was based on Knapp's personal observation of a large number of individuals who are empirically known to have engaged in grooming behavior. It may well be that his testimony was grounded in precisely such extensive personal observation and experience. The problem is that, unlike the situation in *St. Hilaire*, there is no such evidence in this case. As a result, Knapp's testimony reduces to a conclusion that some unquantified percentage of an unquantified number of sex offenders of unspecified nature "groomed" their victims. Moreover, in this case—and in contrast to the expert testimony in *St. Hilaire*—Knapp did not merely testify from personal observation. He testified whether he would conclude that a hypothetical individual had engaged in grooming behavior on the basis of various hypothetical facts put before him. There simply is no foundation for admitting that testimony under *Brown*.

Judge Deits's concurring opinion takes me to task for failing to focus on the methodology by which Knapp arrived at his conclusions about grooming. According to her, because Knapp's testimony consisted of his observations of sexual offenders, the only real issue is whether the methodology—observation—is an accepted scientific technique. 157 Or App at 464. Because that methodology is "well accepted," the concurring opinion concludes that Knapp's testimony is admissible. *Id.* That analysis, however, is predicated on several false assumptions.

First, Judge Deits assumes that the exclusive focus of the *Brown* analysis is the validity of a particular scientific methodology and does not include the inferences drawn from that methodology. As *O'Key* makes clear, however, that is not the case. *Brown* itself refers, as an additional appropriate consideration, to the "nature and breadth of inferences adduced" from the application of a particular methodology or technique. *Brown*, 297 Or at 417 n 5.

Second, she assumes that Knapp's testimony consisted solely of reports of his observations about offenders. As I have demonstrated, his testimony went well beyond that, including an affirmative response to a hypothetical question about whether facts nearly identical to those involved in this case involved grooming behavior as opposed to innocent touching.

Third, Judge Deits assumes that the methodology involved in this case—observation of only 40 offenders—is well accepted. She cites no authority for that assumption. It is, in fact, precisely the sort of assumption we are not to make in performing our gatekeeping function of screening the admissibility of scientific evidence. *Brown* requires the state to *demonstrate* that the methodology applied in this case is well accepted. The state did not do that in this case.

I wish to emphasize that my conclusions are based on the state's evidence in this case. I express no opinion whether, in some other case and on a more complete foundational record, grooming evidence might be admissible under *Brown*.

Wollheim, J., and Riggs, J. pro tempore, join in this dissent.