Argued and submitted December 2, 1982, affirmed January 18, 1983

STATE OF OREGON,
*Respondent on Review,*

*v.*

LAWRENCE E. MIDDLETON,
*Petitioner on Review.*

(TC 80-12-511, CA 21064, SC 28916)

657 P2d 1215

David E. Groom, Salem, argued the cause and filed the brief for petitioner. With him on the brief was Gary D. Babcock, Salem.

Stephen F. Peifer, Salem, argued the cause and filed the brief for respondent. With him on the brief were Dave Frohnmayer and William F. Gary, Salem.

Before Lent, C. J., Linde, Peterson, Campbell, Roberts and Carson, Justices.

CAMPBELL, J.

Roberts, J. concurred and filed an opinion.

## CAMPBELL J.

Defendant contends that his daughter's prior consistent statements of details of her rape and testimony by social workers stating that the daughter's reaction to the rape was typical of such a victim were improperly admitted in his jury trial for rape, and appeals his conviction. The Court of Appeals affirmed. We also affirm.

The 14 year-old child asserted that her father raped her in the early morning of December 23, 1980. She reported the rape to a friend's mother, to a Children's Services worker, and also to a doctor at the hospital. The following day a police officer recorded her statement at the police station. Within the same week she wrote out her statement before testifying before the grand jury. These reports were all consistent.

On February 6, 1981, in the presence of her mother, defense counsel's wife and another woman, the child wrote a statement saying she had lied about the rape. In that note she said that she had not been raped, but that she had lied so she could get "out on her own." She also said she was under a lot of pressure to stick to her original story. She wrote at least two other notes that said the same thing.

At the trial on April 4, 1981, the child, who was the first witness, testified that the defendant raped her. During cross-examination, defendant introduced statements the daughter wrote in February. Following this impeachment, the state offered to introduce evidence from four other witnesses that the daughter had reported the rape to them within two days of the alleged occurrence. The trial court allowed this evidence over objection. The witnesses testified not only that the daughter had told them the rape had occurred, but also two of these witnesses testified at length to details reported by the daughter. Thus, the jury heard a detailed account of the rape three times.

Later in the trial, both the state and the defense presented testimony from two social workers who worked with abused children. Both of them were accepted as expert witnesses without objection. In response to questions from the state, both testified over objection concerning the reactions of young victims of family sexual abuse, and one

testified that the daughter's behavior was typical of most victims. Defendant objected on the basis that this testimony invaded the province of the jury and was opinion evidence.

The defendant denied the rape. He offered testimony suggesting that the daughter stole some money, skipped school, and ran away twice. He also strongly suggested she had been pressured by her older sister and by employees of Children's Services Division to testify falsely.

## PRIOR CONSISTENT STATEMENTS

The court ruled that the testimony of one of the four state's witnesses referred to above was admissible both as a "res gestae"[1] exception to the hearsay rule and as a prior consistent statement; the testimony of the other witnesses was admissible only as prior consistent statements. The state does not assert the "res gestae" exception on appeal, so we do not consider it.

Defendant relies on State v. Yielding, 238 Or 419, 422, 395 P2d 172 (1964), which holds that a witness may testify that another witness complained of rape but may give no particulars unless it fits into the "res gestae" exception.[2] This holding is not controlling in the present

---

[1] "Res gestae" was the term used in the trial court. We note that this inexact term has been used for four different grounds of admissibility of evidence. VI Wigmore, *Evidence* §1767 (Chadbourn rev 1976). In this instance, we believe it to have been used as an "excited utterance." This case was tried before the effective date of the Oregon Rules of Evidence, but we note the corresponding rule would be ORE 803(2):

"The following are not excluded by ORS 40.455, even though the declarant is available as a witness:

"* * * * *

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

[2] ORE 803 (18a) allows the admission of the report of a rape complaint itself, but does not allow any details as an exception to the hearsay rule:

"The following are not excluded by ORS 40.455, even though the declarant is available as a witness:

"* * * * *

"(18a) A complaint of sexual misconduct made by the prosecuting witness after the commission of the alleged offense. Such evidence must be confined to the fact that the complaint was made."

case because it ignores the prior inconsistent statements introduced by the defense. Here the state was attempting to rehabilitate a witness after her impeachment by prior inconsistent statements. Although prior consistent statements are generally inadmissible, there are exceptions. When a witness has been assailed on the ground that she has some motive for testifying falsely, prior consistent statements are admissible.[3] We approve the statement in *State v. Clark,* 26 Or App 55, 57, 551 P2d 1313, *rev den* (1976):

> "Ordinarily a witness's out-of-court statements are not competent evidence to corroborate his in-court testimony. However, where the witness's credibility has been attacked on the ground that his testimony is a recent fabrication or that he had some motive for testifying falsely, evidence that he made consistent statements when the motive did not exist is admissible."

The defendant contended that the daughter invented the rape story so that she could live with her boyfriend and that she testified to it in court because of pressure from various people. The desire to move away from her home was a motive that could have been present before her initial report, so it would not support the admission of prior consistent statements. However, the pressure that the defendant contends various people exerted would be a motive for testifying falsely that did not exist at the time of the initital report, but arose sometime after the initial report. Thus consistent statements would be admissible to rebut it.

Indeed, defendant's trial counsel conceded that these prior consistent statements would have been admissible in rebuttal, but argued that the state should not have been allowed to present them in its case in chief. This

---

[3] ORE 801(4)(a)(B) allows the admission of prior consistent statements as substantive evidence:

"(4) A statement is not hearsay if:

"(a) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

"* * * * *

"(B) Consistent with the testimony of the witness and is offered to rebut an inconsistent statement or an express or implied charge against the witness of recent fabrication or improper influence or motive; * * *"

ignores the fact that the defense itself had already introduced impeaching documents. By defendant's theory, if defendant had presented no other evidence, the state would have been completely foreclosed from rehabilitating the daughter. This is not the law.

We find that the daughter's out of court statements concerning the rape were admissible as prior consistent statements following her impeachment.[4]

EXPERT TESTIMONY

As described above, two social workers were witnesses in this case. The state called L. Bohlen, a juvenile counselor for the county, and the defense presented F. Lindemann, a child protective social worker for Children's Services Division. Both witnesses were accepted as experts without objection, and their expertise is not challenged now.

During Bohlen's testimony, defendant objected to a question concerning the typical response of a rape victim, apparently on the grounds that it would require a comment on the credibility of the victim.[5]

---

[4] There is no issue presented of whether the rape accounts from witnesses other than the daughter herself should be limited to impeachment purposes or could be regarded as substantive evidence.

[5]

"Q. [By State] Have you interviewed children in that — other children like [victim] before in that age range?

"A. [Bohlen] Yes, uh-huh.

"Q. And have you interviewed other children who have reported that they have been abused sexually by a family member?

"A. Yes.

"Q. How do — what is the typical response upon initially speaking with you, a juvenile court worker, in terms of their demeanor, holding their hands and ——

"MR. ROBESON: I'm going to object, I think that people are all individuals and everybody is capable of judging. If he is getting to the point of determining how good a judge she is, whether she is telling the truth, I think that is up to the jury. She can say what she saw, give her opinion as to what she felt, but not as compared to some person who is lying or who isn't or some kind of expert on how these things are handled.

"THE COURT: Overrule the objection, you may answer.

"THE WITNESS: I found her behavior very much in keeping with children who have complained of sex molestation at home."

During cross-examination, the state asked Lindemann if she was familiar with the behavior of the type of children who have reported a claim of rape by a family member and whether the daughter's behavior was consistent with what she described as typical behavior.[6] Defendant objected to both these questions contending that they

---

[6] "Q. [By State] How long have you been a CSD worker?

"A. [Lindemann] For almost twelve years.

"Q. How many children have you seen who have reported that they have been raped by a family member?

"A. I think probably between three and four hundred.

"Q. Are you familiar with behavior of children who have reported this type of claim?

"A. Absolutely.

"MR. ROBESON: Objection, Your Honor, to this whole type of question.

"THE COURT: Take the jury back to the jury room please.

"* * * * *

"THE COURT: Now, your basis of your objections? Why don't you summarize it on the record so I understand it.

"MR. ROBESON: Your Honor, I think this is more or less the actions of the defendant, that is for the jury to — that invades the province of the jury. I think that what we are talking about, on my direct examination I just asked what actual problems did she cause to CSD, meaning what did she physically do? She physically ran away. She skipped school, she did those kinds of things. As to whether she was emotionally upset or anything of that nature, I didn't get into it. I asked if she told her the same story all the time. I didn't get into any of how she acted or what she did, and counsel is getting into that at this time and we have got ——

"THE COURT: So you think it's improper?

"MR. ROBESON: It's improper cross-examination. And I think further, Your Honor, it got to the point where we have these opinions. It's really starting to prejudice the defendant's case.

"THE COURT: And secondly, it's opinion evidence, not admissible?

"MR. ROBESON: That's correct.

"THE COURT: Any other reasons?

"MR. ROBESON: No, Your Honor."

"* * * * *

"[State] "In closing, I suggest to the Court an expert who has an expertise in the subject of sexually abused children can allow the jury to — can assist them to evaluate the behavior of a child subject to the contrary argument that the child lied and made it up. And the child was not lying and made it up.

"THE COURT: That has always been my conclusions as to what the law is. But the difference in what you are doing here and the Harwood

invaded the province of the jury and that the answers would be opinions. We take this to mean opinions that are inadmissible because they are not helpful to the jury, for it is well settled that experts may offer opinions in some situations.[7]

case is she described the sexual acts in that manner and this lady is going to attempt to explain away her actions of skipping school, of the illness possibility.

"MR. HAUB: Retract the story.

"THE COURT: Running away, retracting [sic] up her story. And I think it falls within that general rule, Mr. Robeson, so I'm going to permit it.

"MR. ROBESON: Very well, Your Honor.

"THE COURT: Have the jury brought back.

"Providing she is qualified in this case, as she was in the Harwood case.

"MR. HAUB: Very well, Your Honor.

"\* \* \* \* \*"

[Testimony concerning Lindemann's qualifications]

"Q. (By Mr. Haub) Now, Mrs. Lindemann, regarding the behavior of the child, [victim], of running away from two foster homes, can you characterize that testimony or that behavior of [victim] in terms of other sexually abused children?

"A. Yes, that is very characteristic. What happens with children is that they get very anxious and are guilt-ridden. They carry the responsibility. When we talk about sex victims, we are really talking about victims, and children really assume so much of the guilt and so much of the responsibility for what has happened, that one of the ways that teenage kids and kind of impulsive kids handle that kind of thing is simply to run away. That is a very common kind of thing for a child to do.

"Q. Now, what about retracting reports before a Grand Jury or made to police? What about that?

"A. That is also a very common kind of thing to happen. When a child does do that, again because of the guilt, that they felt the responsibility, they realize this is my father or my stepfather or whatever, this is my parent and I still care for this person. And look what I'm doing to them. And look what I'm doing to my family. And the easiest thing to do, of course, is to say gee, I just made it all up and it isn't true after all. I think that kids would like that to actually be true. They wish it were true, that it hadn't happened.

"Q. Is any of the behavior that you have learned of [victim], in supervising her case, different than other sexually abused children?

"A. No, it's not different at all, it's very typical for a teenage sex abuse victim."

[7] ORE 702:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

■ Defendant's contention that this testimony invades the province of the jury is not well founded. It is the settled law in Oregon that testimony on the ultimate issue is not inadmissible solely on that basis. *State v. Breen,* 250 Or 474, 479, 443 P2d 624 (1968). As we said earlier in *Schwieger et ux v. Solbeck et ux,* 191 Or 454, 472-73, 230 P2d 195 (1951), it is impossible to usurp the jury's function. Even if there is uncontradicted expert testimony, the jury is not bound by it, for the jury alone must make the ultimate decision. *W. R. Chamberlin & Co. v. Northwestern Agencies, Inc.,* 289 Or 201, 207, 611 P2d 652 (1980).

■ Defendant contends that the evidence given by the experts here was a direct effort to support the credibility of the complaining witness. It is true that if the jurors believed the experts' testimony, they would be more likely to believe the victim's account. Neither of the experts directly expressed an opinion on the truth of the victim's testimony. Much expert testimony will tend to show that another witness either is or is not telling the truth. *See State v. Stringer,* 292 Or 388, 639 P2d 1264 (1982). This, by itself, will not render evidence inadmissible.

However, not all expert testimony, opinion or otherwise, is admissible. We recently restated the rule concerning admissibility of opinion evidence by experts in *State v. Stringer, supra,* 292 Or at 391:

> "The test is not whether a jury is capable of drawing its own inferences from the evidence presented. Rather, the test is whether the expert's testimony, if believed, will be of help or assistance to the jury."

If a complaining witness in a burglary trial, after making the initial report, denied several times before testifying at trial that the crime had happened, the jury would have good reason to doubt seriously her credibility at any time. However, in this instance we are concerned with a child who states she has been the victim of sexual abuse by a member of her family. The experts testified that in this

---

ORE 704:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

situation the young victim often feels guilty about testifying against someone she loves and wonders if she is doing the right thing in so testifying. It would be useful to the jury to know that not just this victim but many child victims are ambivalent about the forcefulness with which they want to pursue the complaint, and it is not uncommon for them to deny the act ever happened. Explaining this superficially bizarre behavior by identifying its emotional antecedents could help the jury better assess the witness's credibility.[8]

We recognize that sexual abuse of children is a problem in our culture.[9] Defendant does not deny that this form of behavior may exist following familial sexual abuse, or that the experts described it correctly. It is information that the jury did not have. In the present case, 18 of the

---

[8] This theory has supported admission of testimony concerning "battered wife" syndrome in some jurisdictions. *Ibn-Tamas v. United States*, 407 A2d 626 (DC App 1979); *Smith v. State*, 247 Ga 612, 277 SE2d 678 (1981); *State v. Baker*, 120 NH 773, 775-76, 424 A2d 171 (1980). It also has supported expert evidence of the "battered child" syndrome to show that the injury to the child is not accidental, but part of a pattern of psychological abuse. *See State v. Wilkerson*, 295 NC 559, 570-71, 247 SE2d 905, 911-12 (1978) and authorities cited there. If the psychological make-up of a child batterer is beyond common understanding, it is consistent to view the psychological make-up of the child victim of familial sexual abuse as equally complex.

Testimony concerning "rape trauma syndrome," a syndrome well described in the dissent in *Matter of Pittsburgh Action Against Rape*, 494 Pa 15, 428 A2d 126, 138-143 (1981), was admitted in *State v. Marks*, 231 Kan 645, 647 P2d 1292 (1982), when the issue in a rape trial was consent. The Minnesota Supreme Court, in *State v. Saldana*, 324 NW2d 227 (Minn 1982) and *State v. McGee*, 324 NW2d 232 (Minn 1982), reversed convictions for rape where the issue was consent, because of improperly admitted testimony concerning "rape trauma syndrome." In these cases, the expert described the syndrome, testified whether the witness fit the description of the typical victim, and gave an opinion that the victim had actually been raped. The court noted that this type of testimony could be admissible in an "unusual" case. The court said that a sexual assault on a child or mentally retarded victim would be examples of such unusual cases. *State v. Saldana, supra*, 324 NW2d at 231.

[9] One study reported that approximately 20 percent of female and 9 percent of male children in the United States are victims of child molesters. Comment, *Child Molesting*, 66 Iowa L.R. 623, 626 (1981), citing D. Finkelhor, *Sexually Victimized Children* 53 (1979). Many authorities agree that the reported cases of incest represent the tip of the iceberg. Royce & Waits, *The Crime of Incest*, 5 N. Ken. L. R., 191, 193 (1978). Reports have increased nationally by 71 percent between 1976 and 1979. Comment, *Parent-Child Incest: Proof at Trial without Testimony in Court by the Victim*, 15 Mich. J. L. Ref., 131, 132 (1981), citing *The National Study on Child Neglect and Abuse Reporting, Annual Statistical Report: National Analysis of Official Child Neglect and Abuse Reporting* 5-20 (1980).

prospective jurors questioned during voir dire were asked whether they knew a child victim of sexual abuse or if they had heard of any children who had been abused sexually by members of their families. Fifteen reported that they knew no one who had suffered from this sort of abuse; two others said they remembered hearing reports of such abuse.[10] Because the jurors said they had no experience with victims of child abuse, we assume they would not have been exposed to the contention that it is common for children to report familial sexual abuse and then retract the story. Such evidence might well help a jury make a more informed decision in evaluating the credibility of a testifying child.

■      Perhaps the jury itself would have been capable of deciding whether the daughter's behavior actually fit the pattern decribed by the experts. However, as said in 4 *Weinstein's Evidence* 702[02] (1981) there is no bright line separating issues within the comprehension of the jurors from those that are not. Generally the admission of expert testimony is within the discretion of the trial court. *Yundt v. D & D Bowl, Inc.,* 259 Or 247, 258, 486 P2d 553 (1971). If a qualified expert offers to give testimony on whether the reaction of one child is similar to the reaction of most victims of familial child abuse, and if believed this would assist the jury in deciding whether a rape occurred, it may be admitted.[11]

We recognize that jurors could be so impressed by the "aura of reliability" of expert testimony that they might trust it more than their own perceptions. However, the trial court must first find that the witness is indeed an expert and is testifying to a subject that is a proper one for expert testimony. The court must also find the offered testimony is relevant. Opposing counsel will have an opportunity to attempt to discredit the testimony through cross-

---

[10] The other juror stated that because of her knowledge of sexual abuse, she did not feel she could be an impartial juror. The court excused her.

[11] Recently another court allowed a psychiatrist to testify to the typical response of a victim of familial sexual abuse and whether this victim responded in a typical manner. The court also allowed counsel to ask the doctor whether he believed the child. *State v. Kim,* 64 Hawaii 598, 645 P2d 1330 (1982). We do not go so far.

examination and show any possible bias the expert may have.[12]

■ The dissent from the Court of Appeals stated: "The door is now open to permit an expert or other 'skilled' witness to testify that it is typical behavior for a witness, a victim or a criminal defendant to tell the truth the first time and then later to recant." *State v. Middleton,* 58 Or App 447, 456, 648 P2d 1296 (1982). This is a legitimate concern, but our holding today does not open the door so widely. We expressly hold that in Oregon a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. We reject testimony from a witness about the credibility of another witness, although we recognize some jurisdictions accept it.[13]

■ We hold that if a witness is accepted as an expert by the trial court, it is not error to allow testimony describing the reaction of the typical child victim of familial sexual abuse and whether a testifying victim impeached by her prior inconsistent statement reacted in the typical manner when she made that inconsistent statement.

Affirmed.

**ROBERTS, J.,** concurring.

I am in agreement with the majority opinion but write separately to explain further my reasons for deciding that the testimony of the expert witnesses regarding the behavior of the victim is admissible.

The standards for admissibility of expert opinion testimony are established in Oregon Rule of Evidence 702:

> "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

The requirement that there exist an area of specialized knowledge is the primary issue before us. Is there a

---

[12] It could be argued that some expert witnesses could be advocates of the party who called them.

[13] *United States v. Hiss,* 88 F Supp 559 (SDNY 1950), *aff'd,* 185 F2d 822 (2d Cir 1950), *cert den,* 340 US 948, 71 S Ct 532, 95 LEd2d 683 (1951); *State v. Tafoya,* 94 NM 762, 617 P2d 151 (1980).

body of knowledge identifiable as a familial child sexual abuse syndrome? And if there is, are its manifestations known to the average juror?

The state suggests that expert testimony concerning behavior typical of familial child sexual abuse victims should be admissible in the same way and for reasons similar to those which render battered woman syndrome evidence acceptable.[1] Battered woman syndrome testimony is said to enhance the jury's understanding of the defendant's state of mind at the time of the criminal act. Evidence of familial child sexual abuse syndrome could provide an explanation of the victim's reluctance to pursue prosecution after the criminal event. The former explains the psychological effect on the defendant of a pattern of aggression against her preceding her criminal act. The latter illuminates the psychological effect on the victim of the criminal act itself. Both syndromes are similar because they explain behavior arising from emotion unique to the family relationship. Further, both syndromes attempt to assess the effect of an alleged physical or psychological condition on the witness' ability to perceive and recount the truth. There is no question that the ultimate purpose of such evidence, like most testimony generally, is to bolster the credibility of the witness in whose favor it is used.[2]

---

[1] The battered woman syndrome is a relatively new area of psychological study and its admissibility through expert testimony has not been uniformly resolved by the courts. It is most often used to explain why the defendant perceived herself in imminent danger in support of a defense of self defense, and why the woman did not leave her abuser. *Ibn-Tamas v. United States,* 407 A2d 626 (DC App 1979); *Smith v. State,* 247 Ga 612, 277 SE2d 678 (1981). The syndrome is characterized by 1) a three stage cycle of violence — a tension building stage of minor abuse, an acute battering stage of explosions of uncontrolled violence and a loving respite stage during which the abuser seeks forgiveness and promises reform; 2) the psychological paralysis resulting from this violence; 3) social factors restraining the battered woman from seeking help, and 4) general psychological characteristics of attitude and behavior. *Note, The Admissibility of Expert Testimony on Battered Wife Syndrome: An Evidentiary Analysis,* 77 NW U L Rev 348, 360 (1982).

[2] Evidence of the existence of battered woman syndrome has been used against an accused in *State v. Baker,* 120 NH 773, 424 A2d 171 (1980). The state was permitted to rebut defendant husband's insanity defense in a prosecution for attempted murder of his wife by demonstrating that the marriage fell within the behavior patterns typical of the syndrome and that wife beating is not reflective of mental illness.

The question remains, are there patterns of victim behavior specific to the crime of familial sexual abuse of a child, and readily identifiable as such, which may reliably explain conduct seemingly at odds with behavioral norms? I am persuaded that there are. A significant body of writing has developed addressing intrafamily sexual abuse.[3] The experts, whose qualifications were not challenged, testified that a significant number of sexually abused children become anxious, guilt-ridden and confused in their feelings for their abuser. These children typically respond by running away, or recanting their story, in order to avoid self-imposed responsibility for the violence inflicted on them. The experts then presented to the jury an explanation for such behavior — the child's continued love for the defendant and the child's assumption of responsibility for the act as well as for the resultant disruption in the family.

I am further persuaded that this information is not known to the average juror. Unlike the problem of rape of an adult in a nonfamilial setting, little popular recognition exists of the magnitude of or the motivations for familial sexual abuse. As the jury pool in this case illustrates few prospective jurors are likely to have exposure to the crime. While jurors may be capable of personalizing the emotions of victims of physical assault generally, and of assessing witness credibility accordingly, tensions unique to the trauma experienced by a child sexually abused by a family member have remained largely unknown to the public. As the expert's testimony demonstrates the routine indicia of witness reliability — consistency, willingness to aid the prosecution, straightforward rendition of the facts — may, for good reason, be lacking. As a result jurors may impose standards of normalcy on child victim/witnesses who consistently respond in distinctly abnormal fashion.

Because the experts in this case have demonstrated that significant numbers of sexually abused children respond to the assault with the same patterns of

---

[3] *See, e.g.*, D. Walters, *Physical and Sexual Abuse of Children* (1975); S. Forward & C. Buck, *Betrayal of Innocence Incest and Its Devastation*, (1978); *Sexual Abuse of Children: Selected Readings* (National Center on Child Abuse and Neglect ed. 1980).

"superficially bizarre behavior," 294 Or at 436, the testimony was properly admitted.[4]

---

[4] Careful regulation by the trial court can check the "floodgate" fear expressed in the Court of Appeals dissent. First, the court must determine if a witness is qualified to testify to the syndrome. Second, the court must decide if the testimony is relevant, *i.e.* whether the facts justify the admission of the testimony. *See Buhrle v. State,* 627 P2d 1374 (Wyo 1981) and *People v. White,* 90 Ill App 3d 1067, 414 NE2d 196 (1980) where testimony was not permitted. And, of course, the party opposing the evidence can attempt to discredit the testimony.