Argued and submitted July 23, 2008, affirmed July 1, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL STEPHEN FULMER,
*Defendant-Appellant.*

Josephine County Circuit Court
03CR0731; A127894

211 P3d 942

George L. Derr argued the cause and filed the brief for appellant.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Kaye E. McDonald, Senior Assistant Attorney General.

Before Schuman, Presiding Judge, and Ortega, Judge, and Carson, Senior Judge.

ORTEGA, J.

**ORTEGA, J.**

After a trial to the court, defendant was convicted of murder. ORS 163.115. He asserts nine assignments of error on appeal, most of which we reject without discussion. We write to discuss only defendant's contentions that the trial court erred by allowing the state's psychiatrist—who had examined him previously—to conduct a second examination and by allowing that psychiatrist to comment on his credibility and veracity at trial. For the reasons that follow, we affirm.

Because the state prevailed at trial, we state the evidence pertinent to the challenged psychiatrist testimony in the light most favorable to the state. *State v. Dunlap*, 215 Or App 46, 60, 168 P3d 295 (2007). Defendant shot and killed his neighbor, Ford. Several days before the murder, defendant, a long-time alcoholic, abruptly quit drinking and soon began to exhibit unusual behavior. Defendant's mother described him as "very disoriented and hyper" in the days preceding the murder. He reported that God had visited him as a "bright light" and that Jesus Christ had taken over his television and was "showing him examples of good and evil through the Fox Network." On the day before the murder, defendant, while driving with his father, suddenly shouted, "You hate Clinton. You're done[,] Dad," and began choking his father. Defendant eventually released his father in order to regain control of the truck.

On the day of the murder, defendant crashed his truck into a tree, sustaining injuries, and then left the truck behind and went home. When his mother visited him later that day, he told her that he had left the truck at a local restaurant and asked her to drive him there so that he could pick it up. A sheriff's deputy was already on the scene when they arrived to retrieve the truck, which was badly damaged. Defendant reacted with surprise at seeing the damage and told the deputy that he had gone hiking that morning and had left his keys in the truck. The officer noticed his injuries and inquired about them, and defendant explained that he had fallen while hiking.

Defendant later told a neighbor, Teeters, that he suspected that the victim, Ford, had stolen his truck and that

he would kill Ford and his dogs. Sometime later that day, defendant shot and killed Ford. At approximately 7:00 p.m., Ford's girlfriend found her dog, which had been at Ford's home, in her driveway, covered with blood. When she began toweling off the dog, she discovered that it had been shot and called Ford's home. When there was no answer, she rushed over to Ford's home where she found his body and called 9-1-1.

Officers investigating the murder visited defendant the next day. When Officer Selig asked defendant whether he knew that Ford had been shot, defendant spontaneously volunteered that Ford was "a homo" and had spied on him. When asked what he meant by that, defendant responded that Ford had sexually assaulted him. Because Selig noticed that defendant became aggressive when talking about Ford, he engaged defendant in small talk before continuing any further discussion with defendant about Ford. However, when the discussion returned to Ford, defendant told Selig that it sounded as if "somebody got revenge" by shooting Ford. When Selig asked defendant whether he knew of anyone who had had issues with Ford, defendant identified Teeters as one such person. Defendant informed Selig that he had been home all night and denied having heard any gunshots.

That same afternoon, defendant encountered Selig on a pathway near the crime scene. When Selig explained that defendant could not walk that way because the area was a crime scene and reminded him of their earlier conversation about the shooting, defendant asked Selig, "Is [Ford] dead?" After Selig's affirmative response, defendant repeated his earlier statement that someone had gotten revenge and walked away.

At around 5:00 p.m. that afternoon, defendant attempted to gain access to the crime scene and identified himself as Ford, the victim. When Officer White, who was on the scene, asked him for identification, defendant produced identification bearing his own name. White took defendant to see Selig, who was near Ford's residence, and recounted that defendant had identified himself as Ford. Defendant then confessed to Selig that he had shot Ford. When Selig asked for further details, defendant reported that he had shot Ford

in the head (which was inconsistent with Ford's wounds) because Ford had sexually assaulted him. Defendant agreed to tell White what had happened, adding, "I've been wrestling with it, and I just want it to go away. I'm done."

During his conversation with White, defendant recounted that Ford had visited him at approximately 9:00 p.m. the previous evening and that the two had shared a 12-pack of beer. Defendant told White that he did not drink a lot and that, as a result, the alcohol had "knocked [him] out," causing him to go to bed shortly after Ford left at 10:00 or 11:00 p.m. Sometime later, defendant explained, he had awakened to find Ford sexually assaulting him and pushed Ford away, causing Ford to flee. Defendant told White that, after Ford had fled, he went to his gun locker, retrieved a gun, walked to Ford's house, and shot him in the chest (which was consistent with his wounds). He reported that he was not proud of what he had done. Defendant informed White that he had been in a "haze" since the previous night—which he attributed to having been intoxicated—and that the evening's events were just starting to come back to him.

At defendant's invitation, the officers retrieved the murder weapon and two magazines from a gun locker in defendant's home. The gun was not loaded, but the ammunition in the magazines was later determined to be consistent with the bullets recovered from the crime scene. At Selig's request, defendant agreed to reenact his actions surrounding the victim's murder and told Selig that he "needed to deal with this." After defendant reenacted how he had shot Ford, Selig and another officer transported defendant to the hospital for a sexual assault exam. However, the examination revealed no evidence of a sexual assault, and a blood sample revealed no evidence of alcohol in defendant's system. Defendant was later arrested and charged with murder.

After defendant's arrest, and with his consent, police arranged for him to be examined by Dr. Sasser, a forensic psychiatrist. Sasser concluded that defendant was competent to stand trial. Defendant's odd behavior continued, however, and the trial court ordered that he be transported to the state hospital for an evaluation of his fitness to aid and assist in his defense, as provided in ORS 161.360 to 161.370. Dr. Mason, a

psychologist at the state hospital, conducted a second evaluation and concluded that defendant was psychotic and unable to aid and assist in his defense. Defendant then notified the court of his intent to rely on an insanity defense. ORS 161.295.

The state then exercised its right under ORS 161.315 to have defendant examined by a mental health professional of its own choice. The state chose Sasser. Defendant objected, arguing that, because Sasser had already examined him, there was no need for a second evaluation. Alternatively, defendant asked the court to disqualify Sasser because of his alleged bias in favor of the state and require the state to appoint another examiner. The trial court denied defendant's motion and allowed Sasser to examine defendant. Sasser diagnosed defendant as suffering from alcohol dependence in remission and concluded that, at the time of the murder, defendant had understood the criminality of his conduct and had been able to conform his conduct to the requirements of the law.

At trial, the primary issue was whether defendant suffered from a mental disease or defect when he shot and killed Ford. Defendant contended that, at that time, he suffered from a psychosis caused by his sudden abstinence from alcohol. The state responded that the evidence showed that defendant suffered from alcohol dependency disorder and that, as a matter of law, that disorder is not a mental defect under Oregon law. *See Beiswenger v. PSRB*, 192 Or App 38, 54, 84 P3d 180, *rev dismissed as improvidently allowed*, 337 Or 669 (2004).

The trial court found defendant guilty and, in its verdict, explained that it was rejecting defendant's affirmative defense because defendant suffered from an alcohol dependency disorder and, as a matter of law, that disorder was not a basis for a defense of mental disease or defect. The court further explained that, even if defendant's asserted defense was not excluded as a matter of law, it would nevertheless find that defendant did not lack substantial capacity to appreciate the criminality of his conduct because, on the day after the murder, defendant had lied to the police to protect himself

and suggested that another person could have been the perpetrator. The trial court also noted that, when defendant had finally admitted responsibility, he indicated that he had been struggling with his conscience and was not proud of what he had done. The trial court also found that defendant had had substantial capacity to conform his conduct to the requirements of the law, emphasizing that, on the day before the murder, defendant had choked his father, but eventually stopped doing so.

As noted, we write to address two of nine assignments of error asserted by defendant, challenging first the trial court's denial of his motion to require that another examiner be appointed and, second, the trial court's admission of Sasser's reports and testimony, which he argues impermissibly commented on his credibility and veracity.

We begin with defendant's challenge to the trial court's denial of his motion to require appointment of another examiner. Defendant reiterates on appeal that there was no need for Sasser to conduct a second examination and that, in any event, the trial court was required to disqualify Sasser because of his bias against defendant. The state responds that Sasser's examination of defendant before defendant filed notice of his intent to rely on an insanity defense did not disqualify him from conducting a second examination. Moreover, the state contends that, even if bias could constitute good cause for disqualifying Sasser, defendant did not prove that Sasser was biased against him.

ORS 161.315 provides:

> "Upon filing of notice * * * by the defendant [of his or her intent to introduce evidence of insanity due to mental disease or defect] as provided in ORS 161.309(3), the state shall have the right to have at least one psychiatrist or licensed psychologist of its selection examine the defendant. The state shall file notice with the court of its intention to have the defendant examined. * * * If the defendant objects to the examiner chosen by the state, the court for good cause shown may direct the state to select a different examiner."

That statute gives the state an absolute right to conduct a mental examination of a defendant who intends to rely on an

insanity defense, whether or not a consensual examination was conducted before the defendant gave notice of his intent to rely on such a defense. *State v. Moore*, 324 Or 396, 403-06, 927 P2d 1073 (1996). Thus, here, as in *Moore*, the state was entitled to select an examiner despite the fact that a consensual examination had been conducted before defendant gave notice of his intent to raise an insanity defense. *Id.*

■        In response to a defendant's objection, the court "may" direct the state to select a different examiner "for good cause shown." ORS 161.315. The language of the statute suggests that our review of the trial court's decision, on a showing of "good cause," would be for an abuse of discretion. Here, however, we need not even reach the question of whether the trial court abused its discretion, because defendant did not make a showing of good cause. Even if we assume that an examiner's bias constitutes "good cause" for a change in examiners under ORS 161.315, defendant presented no evidence to support his assertion that Sasser was biased in the state's favor. The trial court therefore was not presented with a basis for requiring the state to choose a different examiner and, accordingly, did not err in denying defendant's motion.

■        We next address defendant's challenge to the trial court's admission of Sasser's reports and testimony, which defendant contends impermissibly commented on his credibility and veracity. At trial, Sasser testified to his belief that, at the time of the murder, defendant could appreciate the criminality of his conduct and could conform his conduct to the requirements of the law. Sasser explained that his conclusion was prompted by inconsistencies in defendant's recollections about his truck and the victim's alleged sexual assault on him, which not only changed over time, but also were inconsistent with objective facts. According to Sasser, his interviews with defendant suggested that defendant was engaging in "purposeful duplicity." The court overruled defendant's objection that Sasser was commenting on defendant's credibility, explaining, "I'm accepting this as the basis for an opinion, rather than a comment on the credibility of [defendant] as a witness." The following colloquy then occurred between the prosecutor and Sasser:

"Q. When you say purposeful duplicity, what do you mean?

"A. For some reason, he was untruthful about—what had transpired [with regard to his truck], and persisted in that untruth often and consistently with respect to the various factors, other than the fact that the truck was stolen. The time sequence sometimes changed from day to day.

"There was just an inconsistency in it, that was not consistent with the facts, and not consistent with his own story several months later.

"* * * * *

"So it—it changed as—as the issues were confronted, facts were sought, the story changed.

"Q. And what does that indicate?

"A. My—that indicates number one, this is not a delusional belief system that's fixed and rigid and is—is any kind of motivating factor in—in whatever his behavior might be.

"Delusional belief systems are fixed, they're consistent, and you stay with it. You don't change it in midstream depending upon this type of answer. This is—this—this suggests an alibi,—

"Q. Okay.

"A. —a reason, trying to justify, and justification of the behavior is *an indication that the person knew that the behavior wasn't right.*"[1]

(Emphasis added.) Defendant did not testify at trial.

Defendant argues on appeal that, by admitting Sasser's testimony and reports, the trial court violated the rule announced in *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983), because the court permitted Sasser to testify about defendant's credibility. At oral argument before this court, defendant asserted that the trial court's verdict

---

[1] The trial court also received into evidence two reports written by Sasser after his interviews with defendant. Those reports contained information similar to that contained in Sasser's oral testimony, including Sasser's conclusion that defendant exhibited "conscious duplicity" and was "deceitful[ ]" and "dishonest."

demonstrates that the court relied on Sasser's report and testimony in rejecting defendant's mental disease defense.

The state responds that the *Middleton* rule applies only to persons who testify at trial and that, even if the rule applied here, Sasser was entitled to explain the basis for his conclusion that, at the time of the incident, defendant was able to appreciate the criminality of his conduct.

In Oregon, no witness may comment on the credibility of another witness. *See, e.g., State v. Milbradt*, 305 Or 621, 629-30, 756 P2d 620 (1988); *Middleton*, 294 Or at 438. However, if a trial court does erroneously allow a witness to comment on the credibility of another witness, reversal is not required if the trial court directs the jury to disregard the inappropriate testimony. *See State v. Brown*, 310 Or 347, 364-65, 800 P2d 259 (1990) (where a police officer testified that he believed that a witness had been "truthful" and the trial court instructed the jury to disregard the officer's statement, the trial court's instruction was sufficient to dispel any possible contamination). When a case is tried to the court, appellate courts presume, unless the record demonstrates otherwise, that the trial court disregarded any inadmissible evidence and based its findings and judgment only on admissible evidence. *Haines Com'l Equip. Co. v. Butler*, 268 Or 660, 669, 522 P2d 472 (1974).

We find nothing in the record here that permits us to depart from that presumption. After defendant's objection, the trial court explicitly stated that it would accept the disputed evidence as the basis for the expert's opinion on defendant's ability to appreciate the wrongfulness of his conduct, not as a comment on defendant's credibility. Defendant suggests that the court must have relied on the disputed testimony in order to find that defendant's untruthful statements to the police were made in an attempt to protect himself. In any event, accepting for the purposes of this opinion defendant's contention that the *Middleton* rule applies in this case (despite the fact that he did not testify), nothing in the record suggests that the trial court based its verdict on the disputed testimony. Even excluding Sasser's testimony, there was other evidence in the record that supported that finding—

specifically, defendant's demonstrably untruthful statements that he had been home all night, that he had not heard any gunshots, that he had been sexually assaulted by the victim, and that he had been intoxicated at the time of the incident. In light of that evidence, we cannot conclude that the trial court improperly relied on Sasser's assessment of defendant's credibility, contrary to its express disclaimer of such reliance.

Affirmed.