Submitted June 21, 2022, affirmed October 11, 2023

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ABUDU IMAMU TRAYLOR,
*Defendant-Appellant.*

Multnomah County Circuit Court
19CR57753; A173795

537 P3d 945

Defendant appeals from his conviction for second-degree robbery. Before trial, the parties agreed that the victim was precluded from making an in-court identification of defendant based on OEC 602, 701, and 403, but the court put on record that the victim may testify to other things that he had personal knowledge of that would come close to an identification, but that are not an identification. On appeal, defendant first argues that the trial court erred by inadequately limiting the victim's testimony under the standards set forth in *State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012). Defendant also asserts that the trial court plainly erred in failing to *sua sponte* strike testimony of a police officer vouching for the honesty of defendant's accomplice, who testified against defendant at trial. *Held*: The Court of Appeals first concluded that the trial court's evaluation of the evidence comported with *Lawson/James* and that the trial court did not err in admitting limited testimony about how the victim came to believe that the robber was the person he had previously been introduced to. Second, even assuming that the trial court plainly erred by failing to strike the officer's testimony, the court did not exercise its discretion to correct that error because it concluded that it was unlikely that any such error affected the verdict.

Affirmed.

Benjamin N. Souede, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Anne Fujita Munsey, Deputy Public Defender, and David Sherbo-Huggins, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Susan G. Howe, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Powers, Judge, and Hellman, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

Defendant, who was found guilty after a bench trial on two counts of second-degree robbery, raises three issues on appeal. His first assignment of error concerns whether the trial court adequately limited the victim's testimony after it excluded a photo throwdown identification of defendant under the standards set forth in *State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012). In his next two assignments of error, defendant asserts that the trial court plainly erred in failing to strike testimony of a police officer vouching for the honesty of defendant's accomplice, who testified against defendant in this proceeding. In his last two assignments of error, defendant argues that the trial court plainly erred in accepting his jury waiver and conducting a trial to the court, which occurred before *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 1402, 206 L Ed 2d 583 (2020), was decided, asserting that his waiver was not knowing and voluntary because he was not aware of his right to a unanimous jury verdict. That issue was decided adversely to defendant's position in *State v. Austin*, 316 Or App 56, 501 P3d 1136 (2021), *rev den*, 369 Or 675 (2022). We reject defendant's arguments on that issue without further discussion in light of *Austin*. With respect to the challenge to the victim's testimony, we conclude that the trial court did not err. With respect to the challenge to the trial court's failure to *sua sponte* strike testimony by the officer as impermissible vouching, we assume for purposes of this appeal that it was plain error for the court to permit that testimony. As explained below, however, we are unpersuaded that it is the type of error that we should exercise our discretion to correct on plain-error review. Accordingly, we affirm.

## I.  CHALLENGE TO HERRERA'S TESTIMONY UNDER *LAWSON/JAMES*

A.  *Background*

We begin with defendant's first assignment of error and the issue of the victim's identification of defendant. Although we ultimately conclude that the testimony that is challenged on appeal was not subject to *Lawson/James*, we lay out a more robust background on the eyewitness

identification testimony because it provides important context for our decision. As explained more fully below, the eyewitness identification evidence was excluded and the remaining testimony—which is challenged on appeal—was considerably more nuanced.

The background facts and procedural history are not in dispute. Before trial, defendant filed a motion to exclude evidence of a photo throwdown, and to preclude the robbery victim, Herrera, from making an in-court identification of defendant. Based on *Lawson/James*, the motion sought to exclude the identification based on OEC 602, 701, and 403. The basis for that motion was that, before the photo throwdown, Herrera had seen a photograph of defendant on the computer of one of the police officers.

At the hearing on the motion, the prosecutor indicated that the parties had reached agreement that the state would not be requesting Herrera to make "an in-court identification of the defendant or present evidence regarding a photo line-up that Mr. Herrera participated in with the police." The court put on the record in open court that, based on an off-the-record discussion in chambers with the attorneys, it understood that "[t]here may be other things within a witness'[s] personal knowledge that come close to an identification but are not," and that the court would consider objections when such issues arose during trial.

Defendant, who waived his right to a jury trial before the parties litigated the motion *in limine*, then proceeded to a trial to the court. Herrera was the state's first witness. He testified that on the afternoon of August 21, 2019, he was approached by two Black men outside the motel where he was living. The taller man was about six-feet tall and had shoulder-length dreadlocks; the shorter man was about five foot six inches to five foot seven inches with short hair and a mustache. Herrera testified that, three days before the robbery, he had interacted with the taller of the two when the man, whom he had seen around the motel on prior occasions, had asked him about obtaining bike parts. On August 21, Herrera was in the parking lot working on a car, and his mountain bike was by his motel room door near where he was working. A surveillance video was shown in court (and

also admitted as an exhibit), and Herrera testified that the two men in the video approached his door, noticed him in the parking lot, then came and spoke with him. The men told Herrera that they were taking his mountain bike because he had stolen it. Herrera grabbed a can of bear mace from his car, but when he raised the can of mace, the taller man threatened to shoot Herrera. The other man then cut the lock on the bike with bolt cutters, and the men began to leave with the bike. Herrera sprayed mace when the taller man had his back turned, but it missed him. After the men left with the bike, Herrera pursued them in his car for a short way. When he returned, others who had been present had notified the police, and Herrera spoke with the police about what had occurred.

At trial, when asked whether he did any of his own investigation to determine who the individuals were, Herrera replied that he had asked others at the motel, and that he passed along the name he had been told by others to the police. When the prosecutor asked Herrera why he believed that the name he provided to the police was "correct," Herrera testified that the person had earlier introduced himself to Herrera as "Black Jesus." Defense counsel immediately moved to strike that answer, and the court sustained defendant's objection. The following exchange then took place:

"Q  [by the prosecutor]: Three days prior to August 21st, when the—what you've testified is that the same man had come to buy a bike part *** is it your testimony that that same man introduced himself as Black Jesus? To you personally?

"A  [by Herrera]:   Prior to that. Prior to that—

"Q:   Prior to the three-day—

"A:   Yeah.

"Q:   Oh, okay.

"A:   I didn't—I didn't recognize him then because his appearance had been different. And I hadn't seen him in a while, so—

"Q:   Okay. So you previously testified he'd periodically been on the property, the same person, but he looked different when he came to see you three days prior this incident?

"A:   Prior to the incident.

"Q:   How so?

"A:   He had—he had gained weight, so he wasn't as thin as he was.

"Q:   Okay.

"A:   So the build had, I guess, made me not realize who he was.

"Q:   Okay, anything else about the person?

"A:   Just his build. I mean, and over time I had—had not really—I mean, I seen a lot of people going through there *** because it's a motel, and there's a lot of different people that check in and check out. So it's not something that—it's not someone that I seen every day or, like, periodically, like throughout the month. It was just here and there, so—. It was hard to find[]—I—I even asked my girl. She asked, 'Who was that?' and I was like, 'I'm not sure. I don't remember his name.'"

At that point, defense counsel interjected:

"[DEFENSE COUNSEL]:   I move to strike the previous answer and questions, because as he goes on, it seems to indicate that he's not testifying that the man who introduced himself previous was the same man that was there who introduced himself as Black Jesus. Because then he goes on to say that he doesn't know that man, et cetera.

"THE COURT:   And you want that struck?

"[DEFENSE COUNSEL]:   Not that part. I want the part where he did the Black Jesus. Where he was introduced as Black Jesus. It doesn't seem like that question—[1]

"THE COURT:   I think that's appropriate for cross."

The prosecutor then clarified that Herrera did not remember the name at the time of the incident, and Herrera responded that that was correct, and that "[w]hen somebody

---

[1] It is not entirely clear from this exchange precisely what testimony defense counsel was suggesting should be stricken. However, given counsel's comment that Herrera was not testifying that he recognized the robber—or the person who asked about bike parts three days earlier—as Black Jesus, we understand the objection to be directed at all of the testimony about how Herrera came to believe that the robber was the same person whom he had been introduced to as Black Jesus despite Herrera not having recognized him.

had said that name \*\*\* it clicked." Herrera added: "I can imagine the same face to the same—to the same person." He, therefore, provided the Black Jesus name to the police.

The state's next witness was Herrera's girlfriend, Schwittau, who lived with him at the motel and had been present during the incident. Schwittau testified that she recognized the taller of the two robbers as someone that she had interacted with three or four times before and who had introduced himself to her as Black Jesus. She described the incident in a manner that was similar to Herrera's account, adding that when Herrera got out the bear mace, Black Jesus said that "if anything got maced then bullets would fly."

The state's next witness was Pati, the shorter of the two men involved in the robbery. He testified that he and Black Jesus went to the motel on August 21 to "get a bike" for his birthday. Pati made an in-court identification of defendant as Black Jesus. He acknowledged that he brought the bolt cutters and that defendant had told him that he had a gun in his backpack. Pati viewed the surveillance video recording that was in evidence, and identified the robbers shown on the video as Black Jesus and himself. He testified that defendant had one hand in the backpack and was waving the backpack around before they took the bike. In his testimony, Pati also acknowledged his criminal history, including unauthorized use of a vehicle, second-degree theft, and making a false statement. He also acknowledged that he was testifying pursuant to a plea agreement that, upon conviction, could result in a 36-month sentence rather than a 70-month sentence.

The next witness was Officer Wingfield, who testified that he responded to the call concerning the robbery. He testified that one of the robbers was known to Herrera but that Herrera did not know his name. Wingfield further testified that he and Officer Baldwin arrested defendant some 10 days after the robbery. Baldwin had viewed the video of the robbery and recognized the second robber as Pati. The officers decided to talk to Pati because "Officer Baldwin has had—has a rapport with him from other incidents and found him to be a pretty honest guy. If you put it into perspective, he's very honest." They talked with Pati on that date and seized the bolt cutters. Pati was arrested several days later.

Wingfield testified that Herrera provided the serial number of the stolen bike and also called him several hours after the robbery and gave the "street name of—moniker of Black Jesus" as a person involved in the robbery.

The state's final witness was a detective, McGuire, who interviewed defendant after he was arrested. McGuire testified that defendant indicated that he went by the name of Black Jesus and that he knew Pati. After telling defendant about the incident and that it was recorded on video, McGuire asked, "Does that ring a bell," and defendant answered, "kinda."

After the state rested, defendant moved for a judgment of acquittal, which was denied. Although the sufficiency of the evidence is not one of the issues raised on appeal, we recount some of what was said because it sheds light on the issues that are raised on appeal. The main argument by the defense at trial was that the motion should be granted because the state's evidence did not sufficiently corroborate the testimony of Pati, who was an accomplice to the crime. *See* ORS 136.440(1) ("A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances of the commission."). The court ruled that there was sufficient corroboration of Pati's testimony because, among other evidence, "Ms. Schwittau reported to the police that Black Jesus committed the crime"; defendant "identified himself as somebody who goes by that street name"; and "Mr. Herrera described someone who matches the defendant's description, and the video likewise matches that description."

The parties then rested their cases and proceeded to closing arguments. In closing, defense counsel emphasized that Herrera had testified that he did not recognize defendant and never identified defendant as "Black Jesus." The trial court found defendant guilty on two counts of second-degree robbery, which ultimately were merged.[2]

---

[2] One of the counts alleged that defendant was aided by another person actually present, and the other count alleged that defendant was armed with what purported to be a dangerous or deadly weapon. ORS 164.405(1)(a), (b).

On appeal, defendant argues that the trial court erred in allowing Herrera to identify one of the men who robbed him as Black Jesus. Relying on *Lawson/James* and its progeny, defendant asserts that, although the court excluded Herrera's testimony to the extent it would have provided eyewitness identification of defendant as a person who committed the robbery, permitting evidence of how Herrera came to believe that the person who robbed him was a person who he had previously met called Black Jesus likewise should have been excluded. Before turning to the particulars of defendant's argument, we provide some detail regarding *Lawson/James*.

B.  *The Oregon Supreme Court's* Lawson/James *decision*

*Lawson/James* consolidated two distinct cases involving very different fact patterns and resulting in two different dispositions. One case concerned an in-court identification of a defendant, Lawson, as the shooter who had murdered the eyewitness's husband and shot the eyewitness in the chest with a rifle. During her transport to the hospital, the eyewitness variously said that the shooter had been at their campsite earlier in the day, that she did not see the face of the shooter, and that the pilot of the transport helicopter was the shooter. 352 Or at 728. In the days and month after the shooting, the eyewitness was shown two photo lineups that included the defendant's picture but was unable to identify the shooter. She told police that the shooter had put a pillow over her face and that she could not see him because it was dark and because of the pillow, and she was equivocal about whether she could identify him. *Id.* at 729. After the defendant was arrested, the eyewitness declined to participate in a lineup because she did not think that she would be able to identify the shooter. The eyewitness later saw a picture of the defendant in the newspaper, was shown a picture of the defendant by police, and was taken by police to secretly observe the defendant during a pretrial hearing. Thereafter, she was able to identify the defendant from one of the photo lineups that she had previously been shown. *Id.* at 730. During the trial, she identified the defendant in court and indicated no uncertainty about his identity as the shooter. *Id.* at 730-31. The defendant moved to strike the

in-court identification due to suggestive police procedures, which the trial court denied.

The other case, by contrast, involved a somewhat more common scenario: Two men, one of whom was ultimately identified as the defendant James, had robbed a grocery store, two eyewitness employees attempted to stop them but failed, and the suspects fled. The eyewitnesses gave detailed descriptions of both robbers, including what they were wearing, to a police officer. *Id.* at 732-33. Subsequently, the officer saw two men who matched the description, detained them, and then drove them back to the grocery store where both employees positively identified the defendant and his companion as the robbers. *Id.* at 733-34. The trial court denied the defendant's motion to exclude the identification, and one of the employees later made an in-court identification of the defendant at trial. *Id.* at 736.

In laying the groundwork for its analysis of the issues concerning eyewitness identification evidence, the Supreme Court observed that beyond basic relevance considerations, the key statutory provisions are OEC 602 (providing that "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"), OEC 701 (requiring lay opinion testimony in the form of opinions or inferences to be "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of testimony of the witness or the determination of a fact in issue"), and OEC 403 (providing for the exclusion of unduly prejudicial, confusing, misleading, or duplicative evidence). *Lawson/James*, 352 Or at 752-53, 756-57. To aid courts in assessing eyewitness identification evidence under those evidentiary rules, the court provided a description of two kinds of variables that are relevant to eyewitness identifications.

First, the court described "system" variables—these concern the circumstances under which an eyewitness is expected to make the identification. *Id.* at 741-42. One type of situation is a "line up" or photo throwdown that would include the suspect and nonsuspects with generally similar physical characteristics. Ideally, these should be conducted "blind," where the official instructing the witness in the

identification procedure does not know the identity of the suspect. Another kind of procedure is a "show up," where police present an eyewitness with only the suspect for identification, which the court viewed as "inherently suggestive" and "less reliable than properly administered lineup identifications" because the eyewitness is aware that the police have targeted the individual. *Id.* at 743.

Second, the court described "estimator variables" that may pertain to the witness, such as the witnesses characteristics (*e.g.*, eyesight, intoxication), the amount of stress the witness was experiencing, the conditions present when the witness made the observation (*e.g.*, lighting, distance), how long the observation lasted, how the witness described the perpetrator, how quickly the identification was made, how certain the witness was of the identification, and the time lapse between the events and the identification. *Id.* at 744-46; *see also id.* at 769-89 (summarizing in a lengthy appendix scientific research and literature on "estimator and system" variables).

C. *Analysis*

In this case, we need not provide a lengthier description of *Lawson/James* and how these various factors are to be assessed. That is because, as noted above, the parties quite understandably agreed before trial that, because police had exposed Herrera to a photo of defendant, no photo throwdown evidence would be adduced at trial, nor would Herrera make an in-court identification of defendant at trial. Defendant argues on appeal, however, that that was insufficient. That is, in defendant's view, Herrera's testimony "that the person who robbed him had previously introduced himself as 'Black Jesus' is an identification" subject to the *Lawson/James* framework. We understand defendant's argument to be, in essence, an assertion that that evidence should have been excluded because it failed to satisfy the requirement in OEC 701(1) that lay opinion testimony must be rationally based on the perception of the witness. In *Lawson/James*, the court explained that, for purposes of an actual eyewitness identification, the "OEC 701 inquiry requires that the trial court initially consider what the witness actually perceived * * * and then determine whether the witness's identification of

the defendant was 'rationally based' on those perceptions."
352 Or at 754. Here, however, the eyewitness identification
was excluded, and the challenged testimony was consider-
ably more nuanced. Herrera did not testify that he recog-
nized defendant during the robbery as the person previously
introduced to him as Black Jesus—or that he recognized
defendant thereafter, for that matter. Rather, Herrera testi-
fied that (1) the person who robbed him had asked him about
bike parts three days earlier, and he had seen him around
the motel before; (2) he did not recognize the man during
the robbery or during the encounter three days before as
the person who had previously been introduced to Herrera
as Black Jesus; (3) after the robbery, Herrera asked others
around the motel about the robber's identity and was given
the name Black Jesus; (4) Herrera believed that he did not
recognize the robber as Black Jesus because his appearance
had changed between the time that they had been intro-
duced and the robbery; and (5) he contacted the police and
gave them the Black Jesus name.

Defendant argues that this was essentially a
"contaminated" identification of defendant as Black Jesus
because Herrera was influenced by the opinions of the peo-
ple around the motel that he had asked. This is, in fact,
essentially a challenge to the admissibility of Herrera's lay
opinion testimony about how he formed the belief that Black
Jesus had been one of the robbers, albeit not a challenge to
"eyewitness" testimony. OEC 701 provides a "liberal stan-
dard for the admissibility of lay opinion." *State v. Davis*, 351
Or 35, 54, 261 P3d 1197 (2011) (citations omitted). What
is required is "a rational connection between the opinion
or inference and the perceived factual basis from which it
derives. The rational connection requirement means only
that the opinion or inference advanced by the witness is one
which a normal person could form on the basis of observed
facts." *Id.* (citations and internal quotation marks omitted).

Defendant's argument would be much more compel-
ling if evidence was admitted at trial that Herrera did in fact
recognize Black Jesus. The evidence that came in, however,
made it clear that Herrera did not recognize Black Jesus
as the robber at the time of the robbery. Importantly, there

was no evidence admitted that Herrera identified defendant either as the robber or as Black Jesus. Rather, the evidence recited above described how Herrera came to believe that Black Jesus had been one of the robbers and explained why Herrera had reported that name to the police. Although it is true that Herrera did testify that he believed that the reason he did not recognize the robber as Black Jesus was because of the difference in appearance, and that after he heard the name from others he could "imagine the same face to the same—to the same person," that is not the same as having made an eyewitness identification. That is, in his testimony, Herrera explained the "rational connection" between his opinion—that the robber had been Black Jesus—and the basis from which it derived: Others had told Herrera that they had recognized him. That testimony was not identification testimony, as it was clear that Herrera himself did not and could not identify Black Jesus; however, the testimony was nonetheless helpful to the trier of fact for the limited purpose of explaining how Herrera came to give the name Black Jesus to the police.

As the court explained in *Lawson/James*, although a trial court should exclude particular aspects of a witness's testimony after evaluating the various system and estimator variables, it may still permit certain testimony: "By excluding the particularly prejudicial aspects of an eyewitness's testimony, trial courts may be able to admit other relevant and probative aspects of that testimony[.]" 352 Or at 759. Here, the trial court properly excluded, on agreement of the parties, evidence of a photo throwdown that was impermissibly tainted by Herrera's viewing of a photograph of defendant before the throwdown occurred and properly sustained counsel's objection to testimony that Herrera thought the robber was the person who had earlier introduced himself to Herrera as Black Jesus. But the court permissibly admitted aspects of Herrera's testimony that demonstrated how he came to believe Black Jesus was one of the robbers and therefore gave that name to the police, which was helpful to the trier of fact in that it explained how the police ultimately came to investigate defendant. The evidence that the court admitted made it clear that Herrera did not recognize Black Jesus as the robber, and the court

did not admit any evidence that Herrera had ever made an eyewitness identification of defendant as Black Jesus or as the robber. Moreover, we emphasize the context here: This is not a situation where Herrera came to believe that the robber was Black Jesus after an impermissible photo throwdown; rather, this is a situation where the undisputed evidence showed that Herrera provided the name Black Jesus to police within two hours of the robbery.

In short, the trial court's evaluation of the evidence comported with *Lawson/James*. Moreover, this was a trial to the court, and statements that the court made in the context of denying defendant's motion for judgment of acquittal reinforce that the court understood that Herrera did not provide an eyewitness identification. As noted, in determining whether Pati's evidence was sufficiently corroborated, the court observed that (1) Schwittau had identified Black Jesus as the robber; (2) defendant had acknowledged that he went by the name Black Jesus; and (3) Herrera "described someone who matches the defendant's description, and the video likewise matches that description." Thus, the court did not err in admitting limited testimony about how Herrera came to believe that the robber whom he could not identify at the time of the robbery was the person who he had previously been introduced to as Black Jesus.

## II.  PLAIN-ERROR CHALLENGE TO THE OFFICER'S TESTIMONY AS IMPERMISSIBLE VOUCHING

Turning to the second and third assignments of error, defendant contends that the trial court plainly erred in failing to strike a portion of Wingfield's testimony. As noted earlier, Wingfield recounted that he and another officer, Baldwin, had talked to Pati after Baldwin identified Pati as one of the robbers in the video. Wingfield testified that they did so because "Officer Baldwin has had—has a rapport with him from other incidents and found him to be a pretty honest guy. If you put it into perspective, he's very honest." The state acknowledges that that testimony was impermissible vouching, although it stops shorts of conceding error. *See*, *e.g.*, *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983); *State v. Pergande*, 270 Or App 280, 284-85, 348 P3d 245 (2015) (concluding that the trial court plainly

erred by failing to strike *sua sponte* a social worker's testimony that the child's complainants did not show signs of being coached when they described alleged abuse). The state contends that it does not meet the requirements for review as plain error, remonstrating that defense counsel could have made a strategic decision not to object to the testimony. *See, e.g.*, *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013) (stating requirements of plain-error review).

Even assuming that it was plain error, we are not persuaded to exercise our discretion to correct it because it is unlikely that any such error affected the verdict. An error is deemed harmless if there is little likelihood that it affected the verdict. *See State v. Horton*, 327 Or App 256, 262, 535 P3d 338 (2023) (explaining that, in evaluating plain error, "[w]e cannot reverse a judgment based on a harmless error, so if the error was truly 'harmless,' then we have no discretion and must affirm"); *see also State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (noting that, under Article VII (Amended), section 3, of the Oregon Constitution, an appellate court will affirm a judgment if there is "little likelihood that the particular error affected the verdict"). As we have observed: "Even if an error does not qualify as 'harmless,' our assessment of where it falls on the spectrum of 'likelihood' of having affected the verdict can be an important consideration to the exercise of discretion. The likelihood that the error affected the outcome goes to its 'gravity' and to 'the ends of justice.'" *Horton*, 327 Or App at 264.

This was a trial to the court, with a significant amount of evidence, including video evidence and eyewitness testimony, that painted a clear picture of precisely how and when the robbery was committed. Moreover, there were no significant contradictions in the evidence as to what had occurred. The testimony that the police officers first talked to Pati because they thought he was "honest" was not in response to a question about Pati's credibility; rather, the evidence was offered in the midst of a description of how the officers investigated the crime, at a point when they had every reason to believe that Pati was one of the perpetrators. And finally, as mentioned in our description of the court's ruling on the motion for judgment of acquittal, it is

apparent that the court was cognizant that, because Pati was an accomplice, his testimony required corroboration—and the court's description of that corroboration had nothing to do with Wingfield's testimony. Moreover, the officer's opinion on Pati's honesty was not something that either party mentioned in their legal arguments to the court, or that the court mentioned at all. *See State v. Murphy*, 319 Or App 330, 339-40, 510 P3d 269 (2022) (declining to exercise discretion to correct the trial court's plain error where the vouching testimony, which was brief, was erroneously admitted in a bench trial, was not mentioned by either party, and the court's decision "made clear that it had made its own credibility determinations" and did not rely on the challenged evidence). In short, we are unpersuaded that, even if the trial court committed plain error by failing to *sua sponte* strike the officer's testimony about Pati's perceived honesty, the gravity of the error, the ends of justice, or some other relevant consideration warrants exercising our discretion to correct the error.

Affirmed.